# FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

|  |  |
|---|---|
| ALVIS COATINGS, INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>JOHN DOES ONE THROUGH TEN, )<br><br>Defendants. ) | Civil Action No. *3:04CV374*<br><br><br>***EXPEDITED CONSIDERATION<br>REQUESTED*** |

## PLAINTIFF'S EMERGENCY MOTION FOR LEAVE TO CONDUCT
## LIMITED EXPEDITED AND PRELIMINARY DISCOVERY

Plaintiff Alvis Coatings, Inc. ("Alvis") moves the Court pursuant to Rule 26(d) of the Federal Rules of Civil Procedure for an Order: (a) allowing Alvis to conduct certain limited discovery immediately; and (b) requiring the third parties upon whom Alvis serves discovery subpoenas to respond to the subpoenas within five (5) business days of the date of service.

Alvis requires limited expedited discovery in this case to identify the Defendants, their locations and legal status for purposes of serving Alvis's Complaint upon them pursuant to F.R.C.P. Rule 4. As set forth more fully in Alvis's Complaint, Defendants have posted many false, misleading and disparaging messages on industry websites, particularly www.bobvila.com and www.oldhouse.com. These postings contain false, misleading and disparaging information regarding Alvis, its dealers, customers, employees, and/or products.



Upon information and belief, Defendants posted these false, misleading and disparaging messages for a number of reasons, including: (a) to cause damage to the business of Alvis; (b) to unfairly compete with Alvis by interfering with the current and prospective contracts of Alvis; and (c) to stimulate reply posts from outraged readers to further cause damage to Alvis, its products, dealers, customers, and employees.

The Defendants' malicious and willful conduct is causing substantial damage to Alvis's business reputation and goodwill with its customers, dealers, and other members of the public. Alvis has received numerous consumer complaints regarding the content of these false, misleading and disparaging postings, and have lost countless current and potential customers. In addition, Alvis has lost dealership opportunities, which directly translates into additional lost sales. Defendants almost certainly will continue to post new false, misleading and disparaging bulletin board messages on industry websites, particularly the Internet bulletin boards of www.bobvila.com and www.oldhouse.com. The operators of these websites, while at times cooperative with Alvis's attempts to prevent harmful bulletin board postings, have refused to provide to Alvis information sufficient to identify the source of these postings.

The Federal Rules of Civil Procedure, as applied to discovery, generally assume that the defendant is known. This is evident in Rule 26(f), which requires a conference between the parties before discovery may proceed. This is impossible, however, under the current circumstances, as the parties responsible for the harmful bulletin boards have successfully concealed their identity. Therefore, it is necessary that an exception be made pursuant to Rule 26(d), so that limited discovery may be taken to determine the identities of these individuals, so that Plaintiff may take the necessary steps to protect its interests.

-2-

Time is of the essence to Alvis in identifying and locating the Defendants. The computer logs and other electronic information necessary to identify Defendants is not maintained by the website operators for significant periods of time. Any delay in the service of subpoenas on third parties in possession of such information could prevent Alvis from ever being able to identify Defendants. Furthermore, delay in all likelihood will lead to continued postings by Defendants and the continued harassment of Alvis, its customers, employees, and dealers. *Physician's Interactive v. Lathian Systems, Inc., Martinez, and John Does 1-10*, No. 03-1193, 2003 U.S. Dist. LEXIS 22868 at *29 – 31 (E. D. Va. 2003) (noting that the presence of electronic evidence further supports the need for expedited discovery as "[e]lectronic evidence can easily be erased and manipulated.") (attached hereto at Exhibit A).

Because Defendants have conducted their attacks in a manner designed to mask their identities, Alvis anticipates that it will need to subpoena the website operators and any Internet service providers (ISP's) identified by the website operators as the source of the messages. Plaintiff is hopeful that after two rounds of subpoenas the proper defendants can be ascertained, but Plaintiff seeks expedited discovery to enable the acquisition of the identifying information before such information is destroyed, and to account for the multiple layers of discovery that may be required.

District Courts have broad power to permit expedited discovery in appropriate cases. *Physicians Interactive v. Lathian Systems, Inc.*, No. 03-1193-A, 2003 U.S. Dist. LEXIS 22868 (E.D. Va. 2003) (attached hereto at Exhibit A); *Benham Jewelry Corp. v. Aron Basha Corp.*, No. 97 Civ. 3841, 1997 U.S. Dist. LEXIS 15957 at *58 (S.D.N.Y. Oct. 14, 1997) (attached hereto at Exhibit B); *see First Commonwealth Corp. v. Public Investors, Inc.*, No. 90-3316, 1990 U.S.

Dist. LEXIS 12743 at *2 (E.D. La. Sept. 25, 1990) (noting that "it is clear from the language that the rules intend to vest discretion in the Court to … shorten the time for [discovery].") (attached hereto at Exhibit C). Expedited discovery is particularly appropriate where, as here, a plaintiff seeks injunctive relief. *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996). Accordingly, courts have ordered that expedited discovery take place with responses to discovery requests due in as few as five (5) days. *See First Commonwealth Corp.,* 1990 U.S. Dist. LEXIS 12743 at *2.

Because of Defendants' ongoing abusive conduct and the danger of the routine destruction of essential records, it is critical for Alvis to secure the requested discovery immediately. Alvis therefore respectfully requests that the Court order that discovery begin immediately in this action for the limited purposes of: (1) determining Defendants' identity, location, and legal status; and (2) preserving any information necessary for Alvis to prosecute its claims against the Defendants. Alvis further requests that the third parties upon whom ALVIS serves discovery pursuant to the Court's Order be required to respond to the discovery within five (5) business days of the date of service.

An example of a Subpoena to be served on the website operators, i.e., www.bobvila.com and www.oldhouse.com, is attached hereto at exhibit D. A proposed Order Expediting Preliminary Discovery in the form recommended by ALVIS is attached hereto as Exhibit E.

Respectfully submitted, this 30th day of July, 2004.

CLT01/4656316v1

Jason M. Sneed (N.C. State Bar No. 29593)
S. Benjamin Pleune (N.C. State Bar No. 28748)
ALSTON & BIRD LLP
Bank of America Plaza
101 South Tryon Street
Suite 4000
Charlotte, NC 28280-4000
Telephone: (704) 444-1000
Facsimile: (704) 444-1111

Attorneys for Plaintiff
ALVIS COATINGS, INC.

-5-

Page 2

2003 U.S. Dist. LEXIS 22868, *; 69 U.S.P.Q.2D (BNA) 1981

LEXSEE 2003 US DIST LEXIS 22868

**PHYSICIANS INTERACTIVE (a division of ALLSCRIPTS, LLC), Plaintiff, v. LATHIAN SYSTEMS INC., STEPHAN MARTINEZ and JOHN DOES 1-10, Defendants.**

**CA-03-1193-A**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION**

**2003 U.S. Dist. LEXIS 22868; 69 U.S.P.Q.2D (BNA) 1981**

**December 5, 2003, Decided**
**December 5, 2003, Filed**

**DISPOSITION:** [*1] Plaintiff's motion for temporary restraining order and preliminary injunction was granted. Plaintiff's motion for limited expedited discovery was granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Plaintiff: Jennifer Tatel, Esquire, Alan Charles Raul, Esquire, Edward R.McNicholas, Esquire, Peter J. Toren, Esquire, Steven E. Klein, Esquire, David S. Grossman, Esquire, Sidley Austin Brown & Wood, Washington, D.C.

For Defendant: Jeffrey W. Kilduff, Esquire, Darin Snyder, Esquire, Ioana Petrou, Esquire, David P. Enziminger, Esquire, Darin Glasser, Esquire, O'Melveny & Myers, Washington, D.C.

**JUDGES:** Gerald Bruce Lee, United States District Judge.

**OPINIONBY:** Gerald Bruce Lee

**OPINION:**

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Plaintiff Physicians Interactive's Motion for a Temporary Restraining Order and Preliminary Injunction, and Plaintiff's Motion for Limited Expedited Discovery. This is a case where the host of an interactive website for medical professionals contends that Lathian Systems,

Inc.'s ("Lathian") information technology employee, Mr. Martinez, secretly hacked Physicians Interactive's website and stole their confidential customer lists and computer software code. n1 The question presented is whether [*2] an injunction should issue where Physicians Interactive has shown probable cause to believe that Lathian's information technology employee used both a Lathian computer and his home computer to hack into Physicians Interactive's web site using computer software to secretly collect Physicians Interactive's customer lists and proprietary software. An injunction will be issued because Physicians Interactive has made a preliminary showing of an invasion of its computer system, unauthorized copying of its customer list, and theft of its trade secrets. Lathian may not use this confidential information to gain an unfair trade advantage; therefore, the Court will enjoin this activity. The Court will also enjoin Lathian, its employee Stephen Martinez, and any other agents of Lathian from any future attacks on the Physicians Interactive website. Finally, the Court will enjoin Lathian and its agents from using any of Physicians Interactive's information previously obtained by Lathian or its employee(s).

---

n1 "Hack" is defined as, "to explore and manipulate the workings of a computer or other technological device or system, either for the purpose of understanding how it works or to gain unauthorized access." *See Microsoft Encarta College Dictionary* 644 (1st ed. 2001).

---

[*3]



Page 3

2003 U.S. Dist. LEXIS 22868, *; 69 U.S.P.Q.2D (BNA) 1981

## FACTUAL BACKGROUND

Physicians Interactive alleges that Defendants Lathian and Stephen Martinez hacked its website by sending "electronic robots" to steal its customer list, computer code, and confidential data. Physicians Interactive runs a website for physicians, <www.physinteractive.com>, featuring medical product and pharmaceutical data. *See* Mem. of P. & A. in Supp. of Pl's Mot. for a T.R.O. and Prelim. Inj. ("Pl.'s Prelim. Inj. Mem.") at 1-5. Lathian runs a similar type of service, <www.mydrugrep.com>. *Id.* Physicians Interactive maintains its file servers in Sterling, Virginia, which is located in the Eastern District of Virginia. n2 *Id.* On its file server, Physicians Interactive maintains an extensive confidential electronic database of the physicians and other medical professionals who use its service. *Id.* Specifically, Physicians Interactive's database contains the names, street addresses, and e-mail addresses of all of its medical professional clients. Physicians Interactive's file server is connected to the Internet, and is accessible by others via the Internet. *Id.* The public, however, does not have access to Physicians Interactive's client [*4] lists. In order to make full use of the Physicians Interactive website, a medical professional must have a user password and personal identification number that has been issued by the Plaintiff. *Id.* The website's most valuable asset is its data lists on medical professionals. These client lists consist of the medical professional's name, title, occupation, speciality, mailing address, e-mail address, telephone number, and fax number. *Id.* at 5.

n2 "File server" is defined as, "a computer in a network that stores application programs and data files accessed by other computers." *See Microsoft Encarta College Dictionary* 533 (1st ed. 2001).

Physicians Interactive alleges that Defendants launched three "attacks" on its file servers to surreptitiously steal confidential data from its website. The attacks were carried out by Lathian's technology employee, Stephan Martinez, to obtain the proprietary medical professional information stored on Physicians Interactive's website. *Id.* at 7-11. The first alleged [*5] attack occurred on January 24, 2003. According to Plaintiff's Preliminary Injunction Memorandum, the computer that accessed Physicians Interactive's computer on that date "began to issue a series of commands to the Physicians Interactive Website Servers in which the URL and query string used by the Physicians Interactive Website Servers had been intentionally altered ... These modifications appeared as part of a calculated effort to discover - through a process of experimentation - the elements of the query string that the Physicians Interactive Website Servers use to ensure that a user logged onto the site accesses only the information on the Website intended for that Medical Professional ... Approximately 50 of these commands were issued." *Id.* at 8. Physicians Interactive did an investigatory audit of this alleged attack, and concluded that the computer which initiated this action had an Internet Provider ("IP") address of 4.18.53.195. *Id.* According to the registration records maintained by the American Registry for Internet Numbers ("ARIN"), this address is registered to <www.mydrugrep.com>, Lathian's website. *Id.*

The Defendants second alleged attack occurred on [*6] January 27, 2003. This attack, according to Physicians Interactive, lasted over 30 hours and "flooded [Physicians Interactive's] servers with a constant stream of commands issued at a rate of approximately 2.4 commands per second. *Id.* at 9. This alleged attack, according to Physicians Interactive, succeeded in accessing a significant number of Plaintiff's proprietary medical professional information. According to Physicians Interactive, because of the nature of the attack, the alleged hacker used a "software robot" or "extraction software" program. *Id.* The purpose of such a program, according to Plaintiff, is to "operate across the Internet to perform searching, copying, and retrieving functions on the websites of others ...." *Id.* The IP address involved in this alleged attack, 68.4.173.153, was registered to Cox Communications, Inc. ("Cox"), an Internet Service Provider ("ISP"). Physicians Interactive subpoenaed Cox to determine what person used this IP address at the time of the alleged attack. However, Cox no longer had the user information from this time period. *Id.*

The Defendants third alleged attack took place on September 10, 2003. The third attack, according [*7] to Physicians Interactive, was similar to the second, and succeeded in accessing an even more greater number of Physicians Interactive's proprietary medical professional information. *Id.* at 10. According to Physicians Interactive, the alleged attack originated from IP address 69.99.188.51. This IP address was also registered to Cox. According to Cox, this IP address was assigned to Defendant Stephan Martinez of Lake Forest, California. Mr. Martinez is an information technology employee of Lathian Systems. Lake Forest, California, according to Physicians Interactive, is approximately 14 miles from Lathian's Newport Beach offices. *Id.*

After Physicians Interactive determined the place and nature of these computer hacking attacks, its

Page 4

2003 U.S. Dist. LEXIS 22868, *; 69 U.S.P.Q.2D (BNA) 1981

information technology professionals implemented a software patch to protect its website from unauthorized access. The purpose of this software patch is to "prevent such unauthorized access from recurring." *Id.* at 12.

Physicians Interactive is suing Lathian Systems, Stephan Martinez, and John Does 1-10 for a private right of action under the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the Virginia Computer [*8] Crimes Act, Va. Code Ann. § § 18.2-152.3, -153.4, the Virginia Uniform Trade Secret Act, Va. Code Ann. § § 59.1-336 *et seq.*, and a common law trespass on chattels claim. In its Motion for Temporary Restraining Order and Preliminary Injunction, Physicians Interactive moves this Court to enjoin Defendants from (1) accessing Plaintiff's website file servers; (2) obtaining confidential proprietary and trade secret information belonging to Plaintiff; (3) using or disclosing any information that Defendants acquired by their allegedly unauthorized and illegal intrusions into Plaintiff's website file servers; and (4) destroying or altering any evidence of such acts. *See* Pl.'s Prelim. Inj. Mem. at 1. Physicians Interactive also seeks expedited discovery in connection with its Motion for Preliminary Injunction.

## STANDARD OF REVIEW

In deciding whether to grant a motion for a preliminary injunction, this Court must apply the four part test set forth in *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir. 1977); *see also Manning v. Hunt,* 119 F.3d 254, 263 (4th Cir. 1997); *Microstrategy Inc. v. Motorola, Inc.,* 245 F.3d 335 (4th Cir. 2001). [*9] The four-part test involves a consideration of the following factors: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Id.* at 195-96. The Fourth Circuit has held that in a *Blackwelder* analysis, harm to both parties is the most important consideration. *See Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 812 (4th Cir. 1992); *see also Wilson v. Office of Civilian Health & Medical Program of the Uniformed Services (CHAMPUS),* 866 F. Supp. 903, 905 (E.D. Va. 1994). The plaintiff bears the burden of establishing that each of the *Blackwelder* factors support granting the injunction. *See id.* In addition, if the probable irreparable harm to the plaintiff in the absence of injunctive relief greatly outweighs the likely harm to the defendant if the Court should grant injunctive relief, then "it is not enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success." *Blackwelder,* 550 F.2d at 196. [*10] Conversely, "the importance of probability of success increases as the probability of irreparable harm diminishes." *Blackwelder,* 550 F.2d at 195.

Physicians Interactive also seeks limited expedited discovery directly related to the issues raised in its Motion for Temporary Restraining Order and Preliminary Injunction. According to Plaintiff's Memorandum in Support of its Motion for Limited Expedited Discovery, Physicians Interactive seeks "a limited number of document requests from Lathian and Martinez that relate, in general, to the circumstances surrounding the illegal intrusion of the PI Website Servers, the persons involved, the scope of the disclosure or dissemination of the confidential and proprietary and trade secret information which was illegally obtained as a result of the intrusions, and the use to which such trade secrets were put." *See* Pl.'s Mem. of P. & A. in Supp. of Pl's Mot. for Limited Expedited Disc. at 3. Physicians Interactive also seeks "a limited number of interrogatories regarding the information downloaded from the PI Website Servers, the location of the computers used to access the PI Website Servers, the identity of persons involved [*11] in the underlying activities, the user of the illegally downloaded data, and the scope of the disclosure of such information." *Id.* Physicians Interactive has attached to its pleadings proposed document requests and interrogatories. Physicians Interactive also seeks to enter the sites where the computers used in the alleged attacks are located in order to obtain a "mirror image" of the computer equipment containing electronic data relating to the Defendants' alleged attacks on Plaintiff's file server.

This Court has "wide latitude in controlling discovery and ... its rulings will not be overturned absent a showing of clear abuse of discretion." *Rowland v. Am. Gen. Fin., Inc.,* 340 F.3d 187, 195 (4th Cir. 2003) (quoting *Ardrey v. United Parcel Service,* 798 F.2d 679, 682 (4th Cir. 1986)). Specifically, Federal Rules of Civil Procedure 26(d), 30(a), 33(b), 34(b) and 36 give this Court the power to adjust the timing requirements imposed under Rule 26(d) [*12] and if warranted, to expedite the time for responding to the discovery sought. Courts have held that expedited discovery is warranted "when some unusual circumstances or conditions exist that would likely prejudice the party if they were required to wait the normal time." *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Helio Import/Export, Inc.,* 601 F. Supp. 1, 3 (S.D. Fla. 1983); *Semitool, Inc. v. Tokyo Electron America, Inc.,* 208 F.R.D. 273, 275 (N.D. Cal. 2002). This Court, in granting motions for expedited discovery, has held that a plaintiff must sufficiently prove the first and second prongs of *Blackwelder,* the "balance of hardships" analysis.

Page 5

2003 U.S. Dist. LEXIS 22868, *; 69 U.S.P.Q.2D (BNA) 1981

*Religious Tech. Ctr. v. Lerma,* 897 F. Supp. 260, 267 (E.D. Va. 1995) (Brinkema, J.)

## ANALYSIS

### A) Irreparable Harm to Plaintiff

The Fourth Circuit has held that a plaintiff must make a clear showing of the irreparable harm it will suffer from the denial of injunctive relief. *Dan River, Inc. v. Icahn,* 701 F.2d 278, 284 (4th Cir. 1983). In accordance with *Blackwelder,* Physicians Interactive has demonstrated that there is a likelihood [*13] of irreparable harm to it if this Court denies the injunction. To date, Physicians Interactive has alleged three computer attacks against its file server. The origin of the second attack is unknown. However, Physicians Interactive has provided affidavits of its information technology staff, which trace the source of the first attack to <www. mydrugrep. com>, Lathian's website. Further, Physicians Interactive has alleged that it has traced the third attack to an IP address registered to Mr. Martinez. Physicians Interactive has shown probable cause to establish that the three hacking attacks described above are directly linked to the Defendants. This preliminary showing demonstrates irreparable harm to Physicians Interactive. Defendants argue that Physicians Interactive fails to show irreparable harm regarding future attacks because Physicians Interactive has, by its own admission, installed a software patch to protect Physicians interactive's computer file server. Defendants' argument has little merit. Although Physicians Interactive has indeed stated that it has installed a software patch that corrects its file server's current security vulnerabilities, such electronic security [*14] systems are not foolproof. The possibility still remains that Physicians Interactive's system could continue to be the target of Lathian's computer hackers. Such future Lathian attacks, if successful, would cost Physicians Interactive time and money through investigation and clean up.

### B) HARM TO DEFENDANTS

The Court holds that the likelihood of irreparable harm to defendant, if the Court grants injunctive relief, is non-existent compared to the likelihood of harm to the plaintiff if the Court does not grant injunctive relief. Under the second prong of *Blackwelder,* the Court must balance the likelihood of irreparable harm to the plaintiff against the likelihood of harm to the defendant. *See Blackwelder,* 550 F.2d at 195. Physicians Interactive argues that the likelihood of irreparable harm to the Defendants is slim, because "defendants Martinez and Lathian will suffer no legally cognizable harm if they are required to stop accessing the PI Website Servers and to stop using or disclosing Physicians Interactive trade secrets and other confidential and proprietary information they have illegally obtained." *See* Pl.'s Prelim. Inj. Mem. at 28. The Court [*15] agrees with this argument. Injunctive relief is proper in this case for two reasons. First, injunctive relief is proper because any injunctive relief that this Court will grant will not prohibit the Defendants from using the authorized, public functions of Physicians Interactive's website. Second, any injunctive relief that the Court will issue will not infringe upon Lathian's right to legally compete within the marketplace for its services. Additionally, the Court recognizes some merit in Defendants' assertion that Physicians Interactive's proposed injunction request is vague. Indeed, the Court finds that Physicians Interactive's proposed injunctive request is overbroad and accordingly will issue a more narrowly tailored form of injunctive relief in a separate order.

### C) LIKELIHOOD OF SUCCESS ON THE MERITS

The Court holds that Physicians Interactive has sufficiently shown a likelihood of success on the merits at this stage of the pleadings on all of its Counts. The third prong of *Blackwelder* requires Physicians Interactive to demonstrate to the Court that it is likely to succeed on the merits of all claims. Counts One, Two, and Three of Plaintiff's First Amended [*16] Complaint allege that Defendants violated subsections (a)(2)(C), (a)(4), and (a)(5) of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. Counts Four and Five of Plaintiff's First Amended Complaint allege that Defendants violated the Virginia Computer Crimes Act ("VCCA"), Va. Code Ann. § § 18.2-152.3, -152.4. Count Six of Plaintiff's First Amended Complaint allege a violation of the Virginia Uniform Trade Secrets Act (the "VUTSA"), Va. Code Ann. § § 59.1-336 *et seq.* Finally, Count Seven of Plaintiff's First Amended Complaint allege a trespass on chattels under Virginia common law.

i) Counts One, Two, and Three (CFAA)

This Court finds that at this stage of the pleadings, Physicians Interactive has proved a likelihood of success on the merits of its CFAA Counts against both Lathian and its agent, Mr. Martinez. The CFAA, although a criminal statute, provides for a private right of action. *See* 18 U.S.C. § 1030(g). A violation of Subsection (a)(2)(C) of the CFAA occurs whenever a person:

> intentionally accesses a computer without authorization or exceeds authorized [*17] access, and thereby obtains - ...(C) information from any protected computer if the conduct involved an interstate or

Page 6

2003 U.S. Dist. LEXIS 22868, *; 69 U.S.P.Q.2D (BNA) 1981

foreign communication. 18 U.S.C. § 1030(a)(2)(C) .

A violation of 18 U.S.C. § 1030(a)(4) occurs whenever a person:

> knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value ... 18 U.S.C. § 1030(a)(2)(C).

In *YourNetDating, Inc. v. Mitchell*, 88 F. Supp. 2d 870 (N.D. Ill. 2000), the Northern District of Illinois held that the plaintiff had shown a likelihood of success on the merits of its CFAA claim when defendant was alleged to have hacked into its computer file server. In *EF Cultural Travel BV v. Explorica,* Inc., 274 F.3d 577 (1st Cir. 2001), the First Circuit held that the competitor's use of a "scraper" computer software program to systematically and rapidly glean prices from a tour company's website, in order to allow systematic undercutting of those prices, "exceeded authorized access" within [*18] the meaning of the CFAA.

A violation of 18 U.S.C. § 1030(a)(5) occurs whenever a person "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage." 18 U.S.C. § 1030(a)(5)(A)(iii). The damage, or loss, must aggregate to at least $ 5,000 within a one-year period. 18 U.S.C. § 1030(a)(5)(B)(i) .

Physicians Interactive has shown probable cause to demonstrate that Lathian's information technology employee, Mr. Martinez, directed two computer attacks against its website and computer file server. Physicians Interactive traced the first alleged attack, which occurred on January 24, 2003, to <www.mydrugrep.com>. This website belongs to Lathian. Physicians Interactive traced the third alleged attack, which occurred on September 10, 2003, to an IP address assigned to Mr. Martinez. The January 24, 2003 alleged attack, according to Physicians Interactive, was designed to obtain technical information about the workings and security vulnerabilities of its website. The September 10, 2003 attack used a "software robot" to obtain proprietary information from Plaintiff. [*19] Both alleged attacks, at this stage of the pleadings, appear more likely than not to fit within the definition of 18 U.S.C. § 1030 (a)(4). These attacks were an unauthorized entry into Physicians Interactive's website. The activity was geared towards copying confidential data. The end result was the loss to Physicians Interactive of something of value - a significant amount of its confidential customer list information.

Courts have held that a loss under the CFAA includes remedial and investigative expenses incurred by the plaintiff. *See, e.g., E.F. Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 584 (1st Cir. 2001); *Four Seasons Hotels and Resorts B.V. v. Consorcio Barr, S.A.,* 267 F. Supp. 2d 1268, 1321 (S.D. Fla. 2003); *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,* 119 F. Supp. 2d 1121, 1126-27 (W.D. Wash. 2000). Physicians Interactive has stated in its affidavit that it has spent in excess of approximately $ 18,750 to assess the extent of the alleged attacks. *See* Pl.'s Prelim. Inj. Mem. at 16.

Defendants contend that Physicians Interactive's website authorized secret collections [*20] of customer lists and computer software code because the Physicians Interactive website does not have a sign posted on its opening page or elsewhere that sets limits on Internet users access to the site. While categorically denying involvement for the alleged attacks on Physicians Interactive's website, Defendants argue that a website with no such posting is open to Internet users for any purpose, including the secret collection of data not generally available and computer code. This extravagant assertion warrants careful scrutiny, as this argument appears to circumvent the spirit of the CFAA, and any other type of statute designed to protect website owners against computer hackers. If Defendants' argument has any merit, it is not for the Court to decide at this time. At this stage of the pleadings, based upon Physicians Interactive's Complaint and allegations, Physicians Interactive is likely to succeed on the merits of a CFAA claim.

ii) Counts Four and Five (VCCA)

As with the CFAA claim, Physicians Interactive has shown a likelihood to succeed on the merits of its VCCA claim. Section 18.2-152.3 of the VCCA provides in pertinent part that this statute is violated when a person [*21] "uses a computer or computer network without authority and with the intent to: (1) Obtain property or services by false pretenses; ... or, (3) Convert the property of another." Section 18.2-152.4(A) makes it unlawful for a person "to use a computer or computer network without authority and with the intent to ... (6) Make or cause to be made an unauthorized copy, in any form, ... of computer data ... residing in, communicated by, or produced by a computer or computer network." Like the CFAA, the VCCA provides for a private right of action. *See* Va. Code Ann. § 18.2-152.12.

Physicians Interactive has traced alleged hacking attacks to Defendants, in which the Defendants obtained

Page 7

2003 U.S. Dist. LEXIS 22868, *; 69 U.S.P.Q.2D (BNA) 1981

property by false pretenses. In this case the alleged computer hacker used a software robot to obtain proprietary information. Based upon this fact, it is highly likely that the hacker, or hackers, converted Physicians Interactive's proprietary information for their own use. It is undisputed that Physicians Interactive's proprietary information was its own property. Likewise, in allegedly converting this property, it is highly likely that Defendants also made an unauthorized [*22] copy of computer data. Again, Defendants argue that if such an attack occurred, it was not unauthorized because of the Plaintiff's failure to place a usage restriction on its website. At this stage of the pleadings, this argument suggests that any Internet user has an open invitation to enter any website and to access the host computer's file server for any purpose including copying customer lists and computer code. Also, at this stage of the pleadings, Defendants argument offends the fundamental principles of ownership of private property. Suppose a private homeowner posted a sign welcoming all authorized visitors into her home. Certainly one would not consider the welcome sign as extending permission to visitors to not only enter, but to plunder through locked drawers in order to obtain confidential checking account and credit card statements. Applying the same analogy to a computer file server does not require much extrapolation. The website invitation to Internet users to visit a website, gather information, and sign up for services is not an invitation for Internet users to hack the website's host computer file server and copy company financial statements or personnel files. No [*23] sign need be posted on a website to protect the web host's property rights. In sum, Physicians Interactive has shown a likelihood that it will succeed on the merits.

### iii) Count Six (VUTSA)

Physicians Interactive has demonstrated a likelihood of success on the merits of its VUTSA claim because Physicians Interactive has shown unauthorized copying of customer lists and proprietary software codes. Physicians Interactive has also shown that customer lists and proprietary software taken in the previously described computer attacks are trade secrets. Physicians Interactive has also shown a likelihood that these trade secrets were misappropriated by Lathian or its agent, Mr. Martinez.

To succeed on a claim under the VUTSA, a plaintiff must demonstrate that (1) the defendant has acquired or disclosed a "trade secret" and (2) that the trade secret has been "misappropriated," meaning that the person knows or has reason to know that the information was acquired by improper means. A trade secret is information that derives economic value from its secrecy and is subject to

reasonable attempts to be maintained as secret. *See Fordham v. OneSoft, Corp.,* No. 00 Civ. 1078-A, 2001 U.S. Dist. LEXIS 22918, [*24] *13 (E.D. Va. 2001); *Newport News Indus. v. Dynamic Test'g, Inc.,* 130 F. Supp. 2d 745, 750-51 (E.D. Va. 2001).

In order to demonstrate the existence of a trade secret, a plaintiff must demonstrate that the information derives economic value from its secrecy and that it was subject to reasonable attempts to maintain it as a secret. Information that would economically benefit competitors, were it to become known to them, satisfies the standard if that information is safeguarded from disclosure in a manner that is reasonable under the circumstances. *See Dionne v. Southeast Foam Conv'g & Pack'g, Inc.,* 240 Va. 297, 302-03, 397 S.E.2d 110, 113-14 (1990). Numerous courts have held that customer lists and customer information are classic examples of trade secrets. *See, e.g., North Atl. Instr., Inc. v. Haber,* 188 F.3d 38, 44 (2d Cir. 1999); *Four Seasons Hotels and Resorts B.V. v. Consorcio Barr, S.A,* 267 F. Supp. 2d 1268, 1325 (S.D. Fla. 2003).

Physicians Interactive's information stored on its computer file server was not meant for the public domain and, therefore, was not stored in the public area of the website. Physicians [*25] Interactive created significant electronic safeguards to protect this information. Indeed, since the alleged attacks, Physicians Interactive has taken additional steps to safeguard this information through a software patch.

Under the VUTSA, "misappropriation" is defined to include the use of "improper means" to acquire knowledge of the trade secret, and the "improper means" are defined to include "theft", "misrepresentation" and "espionage through electronic or other means." Va Code Ann. § 59.1-336; *see Fordham,* 2001 U.S. Dist. LEXIS 22918 at *13; *Newport News,* 130 F. Supp. 2d at 751.

There can be no doubt that the use of a computer software robot to hack into a computer system and to take or copy proprietary information is an improper means to obtain a trade secret, and thus is misappropriation under the VUTSA. Defendants again argue that their access to Physicians Interactive's website was authorized because of Physicians Interactive's failure to place a usage restriction on its website. Again, for the reasons stated earlier, this argument fails to negate Plaintiff's likelihood to succeed on the merits.

### iv. Count [*26] Seven (Trespass on Chattels)

Physicians Interactive has shown a likelihood of success on the merits of its trespass on chattels claim. A common law claim of trespass on chattels occurs "when one party intentionally uses or intermeddles with

Page 8

2003 U.S. Dist. LEXIS 22868, *; 69 U.S.P.Q.2D (BNA) 1981

personal property in rightful possession of another without authorization." *America Online, Inc. v. LCGM, Inc.,* 46 F. Supp. 2d 444, 451 (citing Restatement (Second) of Torts§ 217(b)). Moreover, trespass occurs when the chattel "is impaired as to its 'condition, quality, or value," *Id.* (citing Restatement (Second) of Torts§ 218(b)).

This Court holds that there is a likelihood that the two alleged attacks that Physicians Interactive traced to Defendants were designed to intermeddle with personal property in the rightful possession of Plaintiff. The third alleged attack, which used a software robot to hack into Physicians Interactive's computer system and obtain proprietary information serves as a *prima facie* basis for a claim for trespass on chattels.

Defendants, as with all other of Plaintiff's claims, argue that their access to Physicians Interactive's [*27] website was authorized because of Plaintiff's failure to place a usage restriction on its website. Again, for the reasons stated earlier, this argument does not negate Physicians Interactive's likelihood to succeed on the merits.

Even if Defendants arguments that its access was not unauthorized because of Physicians Interactive's lack of notice on its website has merit, it is not for this Court to decide at this stage of the pleadings. As *Blackwelder* holds, if the probable irreparable harm to the plaintiff in the absence of injunctive relief greatly outweighs the likely harm to the defendant if injunctive relief should issue, then "it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success." *Blackwelder,* 550 F.2d at 196. Physicians Interactive has shown irreparable harm through the costs it must incur to guard against future attacks.

v) Defendant Lathian Systems' *Respondeat Superior* Argument

Defendant Lathian Systems also argues that even if Defendant Martinez's conduct was wrongful, it was outside the scope of his employment with Lathian Systems. Lathian Systems cites *Newport News,* which establishes [*28] a multi-part test for determining whether an employee's conduct was within the scope of employment:

> Generally, an act is within the scope of the employment if (1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some impulse

or emotion that was the natural consequence of an attempt to do the employer's business, and did not arise wholly from some external, independent, and personal motive on the part of the employee to do the act upon his own account. *Newport News,* 130 F. Supp. 2d at 750 (citing *Kensington Associates v. West,* 234 Va. 430, 432, 362 S.E.2d 900, 901, 4 Va. Law Rep. 1269 (1987).

At this stage of the pleading, it is unclear whether Physicians Interactive meets the test to establish *respondeat superior* as defined in *Newport News.* These facts will be elicited through discovery. However, based upon the given facts of the alleged attacks, this Court concludes that there is a substantial likelihood, at this stage of the pleadings, that the Plaintiff would succeed in proving [*29] that Mr. Martinez's alleged actions were within the scope of his employment. Thus, Physicians Interactive succeeds in proving a likelihood of success on the merits on all of its claims.

**D) Public Interest**

This Court holds that there is a strong public interest in granting preliminary injunctive relief in this action. The facts alleged by Physicians Interactive, if true, violate several federal and state criminal and civil statutes. This Court has an obligation to enjoin any alleged computer hackers from continuing to attack and steal Physicians Interactive's proprietary information.

**E) Expedited Discovery**

The Court will grant Physicians Interactive limited expedited discovery. Under a tailored form of injunctive relief issued in a separate order, Physicians Interactive satisfies the requirements for expedited discovery under the *Fimab-Finanziaria, Semitool, and Religious Technology* tests. In addition, Physicians Interactive meets the requirements for expedited discovery because it has successfully met the burden of all of the prongs of *Blackwelder.* Also, this case presents the Court with unusual circumstances or conditions that would likely prejudice [*30] the party if they were required to wait the normal time to initiate discovery. In this case, electronic evidence is at issue. Electronic evidence can easily be erased and manipulated. Physicians Interactive's expedited discovery is limited, however, to the proposed set of document requests and interrogatories that it provided to the Court in its Motion for Limited Expedited Discovery. Physicians Interactive is also granted limited expedited discovery to enter the sites where the computers used in the alleged attacks are

Page 9

2003 U.S. Dist. LEXIS 22868, *; 69 U.S.P.Q.2D (BNA) 1981

located and to obtain a "mirror image" of the computer equipment containing electronic data relating to Defendants' alleged attacks on Physicians Interactive's file server. This discovery is limited only to information on Defendants' computers related to the alleged attacks, and must be done with the assistance of a computer forensic expert.

As discussed above, Physicians Interactive meets its burden under *Blackwelder* and thus the Court will grant it preliminary injunctive relief. Physicians Interactive has shown irreparable harm. Defendants have failed to show they will suffer irreparable harm by the Court's grant of injunctive relief. Physicians Interactive has **[*31]** overwhelmingly shown a likelihood of success on the merits. Finally, there is a strong public interest in granting this injunctive relief.

For the foregoing reasons, Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction is GRANTED. Plaintiff's Motion for Limited Expedited Discovery is also GRANTED. An appropriate order will issue. The Clerk is directed to forward a copy of this Memorandum Opinion to counsel.

Entered this 5th day of December, 2003.

Gerald Bruce Lee

United States District Judge

Alexandria, Virginia
12/05/03

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

LEXSEE 1997 US DIST LEXIS 15957

**BENHAM JEWELRY CORPORATION and J.D. FINESSE, INC. d/b/a/ LINEA AUREA, Plaintiffs, - against - ARON BASHA CORPORATION, Defendant. ARON BASHA, ARON BASHA CORPORATION, Counterclaimants - against - BENHAM JEWELRY CORPORATION, J.D. FINESSE, INC. d/b/a/ LINEA AUREA, and KATHERINE TESS JEWELRY, Counterclaim Defendants**

**97 Civ. 3841 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**1997 U.S. Dist. LEXIS 15957; 45 U.S.P.Q.2D (BNA) 1078; Copy. L. Rep. (CCH) P27,756**

**July 18, 1997, Decided**
**October 14, 1997, Filed**

**SUBSEQUENT HISTORY:** Opinion of October 14, 1997, Reported at: 45 U.S.P.Q.2D (BNA) 1078 at 1094. [*1]

**DISPOSITION:** J.D. Finesse d/b/a Linea Aurea, Katherine Tess Inc. and Behnam enjoined from manufacturing or selling any baby shoe pendants which are substantially similar to the Staurino Fratelli pendants licensed to Aron Basha. Behnam and Finesse recall infringing pendants which have been sold to its wholesale customers. Basha's motion for expedited discovery regarding the full nature of each Counterclaim Defendant's infringing and improper activities granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Plaintiffs: Thomas M. Furth, Peter L. Berger, Jane P. Linowitz, Levisohn, Lerner, Berger, and Langsam, New York, N.Y.

For Aron Basha Corporation, Defendant: George Gottlieb, Amy B. Goldsmith, Gottlieb Rackman and Reisman, New York, N.Y.

For Katherine Tess Jewelry, Counterclaim Defendant: Nancy Dodderidge, Amster Rothstein and Ebenstein, New York, N.Y.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINIONBY:** ROBERT W. SWEET

**OPINION:**

OPINION

**Sweet, D.J.**

Defendants and counterclaim plaintiffs Aron Basha and Aron Basha Corporation ("Basha") have moved for a preliminary injunction precluding Plaintiffs Behnam Jewelry Corporation ("Behnam"), J.D. Finesse, Inc. d/b/a/ Linea Aurea ("Finesse"), and Katherine Tess Jewelry ("Tess") (collectively [*2] "Counterclaim Defendants") from manufacturing or selling certain baby shoe pendants ("baby shoe pendants" or "pendants") which infringe Basha's copyright. Basha has also moved for recall of any infringing baby shoe sold by the Counterclaim Defendants to their customers and for expedited discovery.

For the reasons set forth below, the motions are granted.

**Parties**

Basha is a corporation organized and existing under the laws of the State of New York with a place of business on 680 Madison Avenue, New York, New York. Basha is owned by Aron Basha, and is in the business of designing and marketing fine jewelry, both wholesale and

Page 3

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

retail.

Finesse is a corporation organized and existing under the laws of the State of New York, with offices at 576 Fifth Avenue, New York, New York. Finesse is a manufacturer and distributor of diamonds, gold and jewelry. Through the entity Linea Aurea, Finesse distributes jewelry to stores around the United States. Finesse is owned and run by Robert Etessami ("Robert Etessami" or "Robert"). Linea Aurea is managed by Robert Etessami's brother, Kevin Etessami, ("Kevin Etessami" or "Kevin").

Tess is a company with a principal office located at [*3] 11 Middlesex Road, Great Neck, New York 11021. Tess is owned and run by Katherine Tess Etessami, who is married to Robert Etessami.

Behnam is a corporation organized and existing under the laws of the State of New York, with offices at 23 West 47th Street, New York, New York 10036. Behnam is in the business of the manufacture and the distribution of jewelry at the wholesale level. Jerry Fox ("Fox") is Behnam's sales manager.

## Prior Proceedings

On May 27, 1997, Behnam and Finesse filed a declaratory judgment action, seeking a determination that: (a) Basha's copyright registration of its baby shoe pendants was invalid; (b) Basha's pendant designs are merely variants of designs long available in the marketplace; (c) Behnam's baby shoe pendant were not copied from any of Basha's designs and were not substantially similar; (d) Finesse's baby shoe pendants were not copies of Basha's designs and were not substantially similar.

On May 28, 1997, Basha filed its answer to the declaratory judgment action, asserting counterclaims for violation of federal copyright and trademark laws, injury to business reputation and dilution of trademark under the New York General Business Law, [*4] and common law unfair competition. Also on May 28, 1997, Basha filed the instant motion for a preliminary injunction and temporary restraining order, precluding Behnam and Finesse from manufacturing, displaying or selling infringing baby shoe pendants. On May 29, 1997, this Court granted a three day temporary restraining order, preventing the defendants from displaying or selling any infringing baby shoe pendants at the JCK trade show in Las Vegas, held from May 28 to June 3, 1997.

On June 16, 17, 18 and 19, the Court held an evidentiary hearing regarding the preliminary injunction. On June 24 and June 25, the Court received additional papers from Basha and Finesse, at which time the motion

was considered fully submitted.

## Findings of Fact

### I. Basha's Acquisition of Rights in Baby Shoe Pendants Designed by Staurino Fratelli

Basha has been in the jewelry business since 1959. He formed Aron Basha Corporation in 1991 to sell fine jewelry at the retail and wholesale levels. Basha's retail business is located on Madison Avenue in Manhattan. Since December 1996, Basha has held a license for the exclusive distribution of baby shoe pendants manufactured by Staurino Fratelli, [*5] an Italian jewelry design firm, and has owned the United States copyright for the pendants. At the wholesale level, Basha sells only Staurino Fratelli baby shoe pendants and accessories that complement the pendants. Basha also offers Staurino Fratelli baby shoe pendants for retail sale. The pendants are made from 18 karat gold, and 18 karat gold, and come in three basic shapes: (a) with a bow set on a band across the toe; (b) with a strap across the instep and a band across the toe; (c) with a strap across the instep and no band. The shoes are made of 14 karat gold or silver. Some are ornamented with french enamel in bright pastel colors and/or precious stones in various arrangements. The price of the pendants ranges from $ 900 to $ 3,600, depending on the number of diamonds set in the shoe, and the intricacy of the ornamentation.

The pendants were designed by Staurino Fratelli, an Italian firm in the business of the design, manufacture and wholesale of fine jewelry. The baby shoe pendants were first designed in April of 1994, after discussions of the concept between Luigi Staurino, David Staurino and a designer named Barbara Dragoni ("Dragoni"). Luigi Staurino instructed Dragoni [*6] to design baby shoe pendants in a specific shape, using bows or straps and colorful ornamentation. After Dragoni drafted the design, David Staurino created the first sample in plaster and then in wax. He spent two months adjusting the proportions of the original design as to length, width, and the use of a bow or strap, as well as ornamentation with precious stones and/or french enamel. Neither Dragoni nor David Staurino consulted actual baby shoes in designing the baby shoe charms.

Staurino Fratelli began marketing the baby shoe pendants in June 1994 at the Vicenza jewelry trade show in June 1994. n1 Subsequently, the baby shoes were prominently displayed in the window showcases at the Staurino Fratelli booth in all the major jewelry trade shows. Each of the baby shoe pendants are made according to the shapes and proportions established in the original model. Although the shoes are sold individually, Staurino Fratelli consistently advertises and

Case 3:04-cv-00374-CH   Document 3   Filed 07/30/04   Page 15 of 38

Page 4

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

displays the shoes in a group in order to create a strong impression of the design.

n1 The major jewelry trade shows include: the Vicenza trade show, (the "Vicenza show"), which attracts a worldwide attendance and is held three times a year; the Valenza trade show, (the "Valenza show"), which occurs twice a year; the Basel trade show, (the "Basel show"), which attracts worldwide attendance and occurs once a year. (Collectively, the "major trade shows.")

[*7]

Staurino Fratelli advertised its baby shoes widely in the following magazines: Valenza Gioielli, an Italian trade magazine for jewelry, in March and April 1995, February, March and April 1996, and January 1997; Vogue Gioielli in December 1995, December 1996 and April 1997; and Vicenza Magazine in June 1996 and June 1997. These magazines are shipped to members to the jewelry trade, buyers coming to exhibitions and a number of shops around the world. Staurino Fratelli has spent approximately $ 100,000 on advertising.

As a result of their advertisements and trade show displays, Staurino Fratelli has received telephone orders from the United States, South America and the Far East. The first sales of Staurino Fratelli's baby shoe pendants were made to Japanese and British companies in August of 1994. Staurino Fratelli obtained a patent for their baby shoe pendant designs from the Italian Government on July 23, 1996. As a result of the number of pieces sold, the income accruing from these sales, and the amount of money invested in advertising, the baby shoe charms are now the most important product made by Staurino Fratelli.

Basha first saw Staurino Fratelli's baby shoes pendants at the [*8] Vicenza show in June 1995. Although Basha has attended the major jewelry trade shows since 1993, he had never noticed any other baby shoe pendants. Basha bought ten to fifteen baby shoe pendants from Staurino Fratelli for retail sale in his shop in 1995 and 500 pendants in 1996.

On December 23, 1996, Basha entered an agreement with Staurino Fratelli for the exclusive right to sell its baby shoe pendants in the United States. On December 26, 1996, Basha obtained copyright registration for the baby shoe pendants. The registration application stated that the registered work, entitled "It's Shoe Time", is a jewelry design authored by Staurino Fratelli first published in November of 1994. The application was accompanied by one of Basha's photographic

advertisements depicting twelve different versions of Staurino Fratelli's baby-shoe pendant, six with bows and six with straps, and each ornamented differently with diamonds, french enamel or both. n2

n2 In detail, the pendants depicted in the deposit photograph may be described as follows: (a) four pendants in enamel-covered gold with straps and bands, and seven diamonds set on the toe; (b) four pendants in enamel-covered gold with a diamond-covered bow set on a diamond-covered band across the toe; (c) two pendants, one in gold, one in silver, with a bow set on a band, entirely covered with precious stones; (d) one pendant made of silver with a strap, no band, and diamonds covering the toe only; (e) one pendant in enamel-covered gold with a diamond-covered strap across the instep, a band across the toe.

[*9]

Basha displays the baby shoes prominently in the window of his Madison Avenue store. He has advertised the shoes in national magazines such as Manhattan File, Hampton magazine, Vogue Gioielli, W, Town and Country, and Parenting. Basha also mailed approximately 3,000 postcards to customers of American Express, displaying a photograph of the baby shoe pendants. The advertisements identify the pendants as baby shoes "designed exclusively for Aron Basha by Staurino Fratelli." Basha spent over $ 150,000 on advertising the pendants. In response to his advertisements, Basha has received numerous phone orders for the baby shoe pendants. So far in 1997, he has sold 1,200 to 1,500 pendants.

In early 1997, Basha became aware of baby shoe pendants offered for sale by Finesse d/b/a Linea Aurea, Tess and Behnam. Basha immediately instructed his counsel to send cease and desist letters to each of the alleged infringers. n3 The letter was sent to Tess on May 2, 1997, to Finesse on May 14, 1997, and to Behnam on May 13, 1997. On May 29, 1997 Basha obtained a temporary restraining order from this court, prohibiting Finesse, Tess and Behnam from displaying any infringing baby shoe pendants at the JCK [*10] Jewelry Trade Show which taking place in Las Vegas from May 28 to June 3, 1997, (the "Las Vegas show").

n3 Basha sent an additional warning to other participants in the Las Vegas show, advising that Basha's baby shoe line of jewelry products was

Page 5

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

protected by copyright. Basha also placed an advertisement in National Jeweler magazine, which is distributed to the jewelry trade twice a month, warning against infringement of Basha's copyright in the "It's Shoe Time" line of baby shoe jewelry. The warning included the photograph of the baby shoes pendant which was deposited with the copyright registration.

Once at the Las Vegas show, Basha inspected the Finesse d/b/a Linea Aurea booth to determine whether they were abiding by the temporary restraining order issued by this Court prohibiting display or sale of infringing baby shoe pendants. In the Linea Aurea display window, Basha saw six baby shoe pendants which were made of gold, with straps or bows and a band across the toe, covered with two colors of french enamel [*11] and set with diamonds. In short, the pendants closely resembled his own.

Basha also obtained an invoice from Behnam which indicated that, despite the restraining order, baby shoe pendants had been offered for sale and ordered by a customer.

## II. Infringement by Finesse d/b/a Linea Aurea

Finesse and Linea Aurea appear to have copied Basha's pendants by importing baby shoe pendants from another Italian company which copied the Staurino Fratelli design, and by using the imported copies to manufacture its own pendants. n4

n4 Before relating the circumstances which establish this inference, it may be helpful to describe the two processes by which the imported baby shoe pendant could be copied.

In first process, called the "lost wax" process, the model maker uses the finished piece as a physical design, and sculpts a wax model, excluding any stones set in the finished piece. The wax model is given to a caster, who attaches the model to a tree, a wax rod that holds the model in place. Model and tree are placed within a steel cylinder which is set onto a rubber base, the tree fixed into a hole in the rubber base. The caster then pours plaster of paris, which is called the "investment", around the wax model and tree. After the plaster sets, the wax model and tree are burned out of the plaster, and silver is poured into the plaster. The investment is broken open, leaving a silver model of the pendant attached to a silver rod. The silver model is filed and cleaned.

If the product is to be finely crafted, the caster will drill holes in the silver cast to allow stone settings to be soldered into it at a future point. If it is not to be a fine piece of work, the caster will drill holes in the silver casting and solder in settings so that the settings will become part of the next version of the model. The caster then makes a rubber mold of the silver model by placing raw rubber in a frame, and placing the silver model between the layers of rubber. The rubber is vulcanized and cut into two halves, which become the two halves of the mold. Molten wax is shot into the rubber mold, and the investment process is repeated. The resulting plaster mold can be used to cast the finished pieces in gold, brass or silver. The size of the copy will vary according to the skill of the model-maker in carving wax, and according to variables in the vulcanizing process.

The second method is called the "knock off" method. In this process any stones would be removed and the original pendant might also be silver-plated to add thickness for later filing and polishing of the copy. The original is then attached to a sprue, a rod, and placed within layers of raw rubber which is vulcanized. The lost wax process is then utilized to create a silver model and a plaster mold. The finished casts are filed and polished, and stones are set. The dimensions of the copy would be smaller than those of the original.

[*12]

In 1996 Kevin Etessami imported five to ten baby shoe pendants manufactured by an Italian jewelry manufacturer, Mario Della Carbonare, also called MDC (the "MDC baby shoe pendants"), which had been found to be infringing copies of Staurino Fratelli's designs by a trade fair jury at the Vicenza show in June of 1996. The trade fair jury is an organization that polices the use of jewelry designs at trade shows. The jury found the MDC shoes to be infringing copies, and ordered MDC to remove the pieces from their exhibit and the show catalogue and to cease any sales of the pieces. David Staurino later learned that, although MDC had removed the baby shoes from their window display, they had continued to offer the shoes for sale. n5 In September of 1996, Finesse, through Linea Aurea, purchased these pendants from MDC and began to sell the imported MDC baby shoe pendants in the United States.

n5 Staurino Fratelli sent MDC a warning

Page 6

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

letter dated July 4, 1996, directing MDC to cease production, exhibition or sales of its baby shoe jewelry, and, according to David Staurino, continues to pursue its claim against MDC in Italy.

[*13]

The Etessamis also unsuccessfully attempted to import the actual Staurino Fratelli pendants. In January of 1997, Kevin Etessami visited the Staurino Fratelli booth at the Vicenza trade show with his sister-in-law Katherine Tess and expressed an interest in marketing the Staurino Fratelli baby shoe pendants in the United States. Etessami did not mention that he was already importing the MDC baby shoe pendants. David Staurino informed Etessami that the exclusive agreement with Aron Basha prevented Staurino Fratelli from selling the shoes to other American distributors. Etessami then remarked that he might distribute the shoes in the Far East and South America, and placed an order for four models. Katherine Tess also ordered some baby shoe pendants for her personal use. Two weeks later, Staurino Fratelli sent Etessami a letter declining to ship his order because it conflicted with agreements with other Staurino Fratelli distributors in the Far East, South America, as well as the agreement with Basha in the United States.

As regards the Etessamis manufacture of pendants in the United States, conflicting testimony was heard as to whether the Etessamis copied the MDC copy of Staurino Fratelli's [*14] design, or whether they used pendant designs which had been created independently of the Staurino Fratelli designs to manufacture their pendants.

Robert Etessami testified that in late 1984, he had seen a photograph of a baby shoe pendant in Sotheby's catalogue, and asked a designer named Mario Archangel ("Archangel") to create a baby shoe pendant design of baby shoe pendants. Between 1984 and 1996, the resulting models were not used.

Archangel testified that he was approached by Robert Etessami in 1984 to design a baby shoe pendant based on a photograph in a Sotheby's catalogue. Archangel created thirteen drawings based on the Sotheby's photograph, and nine silver models based on the drawings. He gave the drawings and models to Robert Etessami in 1985. Archangel had no further conversations with Robert regarding baby shoes until the fall of 1996, when Robert called and told Archangel that Finesse had imported some baby shoe pendants from Italy and intended to produce pendants from the baby shoe models made in 1985.

Kevin and Robert Etessami testified that the

Archangel models were used to manufacture Linea Aurea's pendants in 1996. However, the weight of testimony by both the Etessamis [*15] is lessened by their self-interest in proving independent creation of the pendants. Moreover, certain discrepancies in other parts of Kevin Etessami's testimony further weakened his credibility. n6

n6 For example, Kevin Etessami testified that he saw Basha's expert witness, Isaac Ainetchi, at the Las Vegas show with Basha. However, Ainetchi established that during the show he was not in Las Vegas.

Daniel Baez, the mold-maker employed by Kevin Etessami testified that he made baby shoe pendant molds for the Etessamis sometime before December, 1996. However, he could not positively identify the Archangel models as the basis for those molds. Baez also testified that one of the models from which molds were made for the Etessamis has been lost since February or March, 1997.

The pendants created from this missing model closely resemble one of the imported MDC pendants which in turn appear to be a copy of Staurino Fratelli's designs. Staurino Fratelli makes a gold pendant with a diamond-covered bow set on a diamond-covered [*16] band across the toe. The MDC pendant is made of gold, with a plain bow set on a diamond-covered band across the toe. The Linea Aurea pendant is made of gold, with a diamond-covered bow set on a diamond-covered band across the toe. All three pendants are very similar in their rounded proportions and size. The Linea Aurea pendant is very slightly smaller than the MDC pendant. The similarity between the MDC pendant and the Linea Aurea pendant raises the inference that the Linea Aurea pendants were manufactured by copying the MDC pendant rather than using models made by Archangel.

According to testimony of an expert in the jewelry business, a credible and qualified witness, the Linea Aurea pendant was copied from the MDC pendant. The smaller size of the Linea Aurea pendant would result from the copying process, during which the copy of the baby shoe would lose 10 percent of its weight and mass.

The production of Linea Aurea's U.S. manufactured baby shoe pendants was completed sometime between August or September and December of 1996. Kevin Etessami first sold the U.S. manufactured pieces in December of 1996. He first displayed the pieces at a jewelry trade show in Orlando in early February [*17] of 1997. Etessami testified that he has sold approximately $

Page 7

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

100,000 worth of baby shoe pendants, both imported and U.S. made, between September 1996 and May 1997.

In May 1997, the Etessamis published an advertisement for Linea Aurea jewelry in the brochure for the Las Vegas Show. The photograph in Linea Aurea's ad included two baby shoe pendants, one of which was the MDC pendant. On May 14, Finesse received a cease and desist letter from Basha. After issue of the temporary restraining order from this Court, Kevin Etessami removed the MDC shoes from his display at the Las Vegas show, but he continued to display the Linea Aurea made baby shoe pendants. As described above, the displayed pendants closely resembled those carried by Basha.

### III. Infringement by Katherine Tess Jewelry

Tess sells accessories and jewelry in a business which she began in Great Neck Long Island two years ago. As set forth above, in January 1997, Tess visited the Staurino Fratelli both at the Vicenza show with her brother-in-law, Kevin Etessami. During the visit Tess attempted to purchase several Staurino Fratelli pendants as part of Kevin Etessami's larger order. However, when Kevin's order was canceled, [*18] Tess' order was also not filled.

In January or February of 1997, Tess saw one of Basha's promotional postcards depicting baby shoe pendants. In March or April 1997, Tess obtained 29 baby shoe pendants from Kevin Etessami and prepared a post card to advertise her own business. Kevin Etessami testified that eight of the shoes depicted in the postcard were made from Archangel models, and thirteen of the shoes were made from the model lost by the mold-maker, Daniel Baez. The remaining eight pendants were purchased from an Italian supplier, who was also the supplier of the MDC pendants.

Tess' postcard resembled Basha's in the arrangement of the pendants. Both postcards show a thick chain across the top linking the pendants. Both carry the name of the business in fancy script above the chain. Both display an array of other pendants below the chain, although Basha's pendants are linked by a fine gold chain and Tess' pendants are not. The cards are also approximately the same size, although Tess' is slightly narrower.

The individual pendants depicted in Tess' postcard, which she obtained from Linea Aurea, also resemble pendants depicted in Basha's postcard:

(a) sixteen of Tess' pendants [*19] are made of enamel-covered gold, with a diamond-covered bow and contrasting color on toe and heel; several of Basha's pendants meet that same description;

(b) three of Tess' pendants are made of enamel-covered gold, with a diamond-covered strap, and a gold band across the toe; several of Basha's pendants do as well;

(c) two of Tess' pendants have a diamond-covered strap and a plain gold or silver surface; none of the pendants in Basha's postcard meet that description, but Basha does carry such a pendant;

(d) three of Tess' pendants have a bow set on a band across the toe and are completely covered with diamonds, or are covered with diamonds on the bow and toe only; several of Basha's pendants have a bow set on a band and are completely covered with diamonds, although none are covered with diamonds on the bow and toe only.

On May 2, 1997 Tess received a warning letter from Basha regarding infringement of his copyright in the baby shoe pendants and of his advertisement design. In response, Tess entered an agreement with Basha that she would no longer offer baby shoe pendants for sale.

### V. Behnam's Infringement

Jerry Fox, the sales manager of Behnam jewelry responsible [*20] for developing a new baby shoe product for Behnam, testified that he first thought of marketing baby shoe pendants in 1996 as a result of a trend in baby jewelry. Fox had attended the Vicenza show in January of 1996 and the Basel show in April of 1996 at which Staurino Fratelli baby shoe pendants were prominently displayed. Behnam does not itself manufacture jewelry, but contracts with model makers and casters outside the firm. In September of 1996 Fox asked a designer named Christine Szeto to create baby shoe pendants, and gave her some sketches he had made. Fox's sketches were not presented into evidence and he did not know whether Szeto used the sketches or other sources to create her designs. Behnam did not make Szeto available for testimony. Moreover, there were several differences between the Szeto designs and some of the finished Behnam baby shoes. For example, one Szeto design depicted a metal bow and stones set around the opening of the baby shoe, but the corresponding finished Behnam pendant had stones set in the bow, but not at the opening. This latter arrangement of stones more closely resembles the Staurino Fratelli design than designs by Szeto. Finally, no testimony from [*21] the model-maker or caster of the maker of the Behnam shoes was offered which would establish the use of the Szeto designs.

Behnam's first sales of the baby shoes were to Macy's of California in November of 1996. All its shoes were made in 14 karat gold and the average retail selling

Page 8

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

prices of Behnam's shoes was about $ 199.

In April of 1997, Behnam sent a mailing of approximately 6,000 postcards depicting six of its baby shoe pendants. A comparison of the pendants in the Behnam postcard to those carried by Basha reveal a strong resemblance, as follows:

(a) two of Behnam's pendants are made of gold, with a bow set on a band across the toe, and diamonds covering both bow and band, one with an emerald set in the center of the bow; Basha offers a gold baby shoe pendant with a bow set on a band across the toe, with diamonds covering bow and band;

(b) two of Behnam's pendants are made of gold, with a diamond-covered strap across the instep, a band across the toe, and diamonds set on the toe, four in a cluster on the right hand side, and three set in a triangle pattern on the left hand side; Basha offers a gold pendant with a diamond-covered strap across the instep, a band across the [*22] toe, and diamonds set on the toe in the identical pattern, although Basha's pendant is also covered with french enamel in two colors;

(c) one of Behnam's pendants is made of gold, with a strap across the instep and diamonds covering the toe; Basha offers a gold pendant with a strap across the instep and diamonds covering the toe;

(d) one of Behnam's pendants is made of gold, with a diamond-covered strap across the instep and a band on the toe; Basha offers a pendant made of gold with a diamond-covered strap across the instep, although there is no band on the toe.

Finally, Behnam's pendants are similarly proportioned and approximately the same size as those carried by Basha.

On May 13, 1997, Behnam received a cease and desist letter from Basha's attorneys, directing it to stop marketing its baby shoe pendants and to send all records to Basha's counsel. After learning of the temporary restraining order issued by this Court, Fox directed the Behnam staff at the Las Vegas show to remove display photographs and printed material regarding the shoes, and to remove the shoe pendants themselves from the showcase. However, an order form from Behnam dated June 1, 1997, the period of the Las [*23] Vegas show, lists six different types of baby shoe pendants which were ordered by one of Behnam's customers.

## VI. Affect of Infringement on Basha

Basha had received numerous complaints from his customers and authorized retailers regarding the presence of "knock-offs" being sold in the marketplace at a lower price than Basha's baby shoe pendants. The baby shoe pendants marketed by Finesse, Tess and Behnam are manufactured with gold of lesser quality, fewer precious stones and their design is less intricate and detailed. Basha reports that consumers who are familiar with his baby shoes will believe that Basha has gone into the lower market business, and that the confusion and complaints caused by the alleged infringement has reduced his business by 30 percent. Several exclusive retailers have informed him that they will not market his baby shoe pendants if knock-offs are generally available in the marketplace.

## Conclusions of Law

Basha has asserted his request for injunctive relief based on his counterclaim for copyright infringement and has not pressed or briefed his claims for trade dress infringement, dilution or unfair competition. Injunctive relief against [*24] a putative infringer should be granted when the moving party shows: (1) either (a) likelihood of success on the merits, or (b) sufficiently serious questions on the merits and a balance of hardships tipping decidedly in plaintiff's favor; and (2) likelihood of irreparable injury. Richard Feiner and Company, Inc. v. Turner Entertainment Co., MGM/UAU, 98 F.3d 33, 34 (2d Cir. 1996); Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp., 25 F.3d 119, 122 (2d Cir. 1994); Topps Company, Inc. v. Gerrit J. Verburg Co., No. 96 Civ. 7302, 1996 WL 719381 (S.D.N.Y. Dec. 13, 1996).

## I. Basha has Demonstrated Likelihood of Success in His Infringement Claim

In order to establish a claim for copyright infringement, a plaintiff must show ownership of a valid copyright and the defendant's infringement by unauthorized copying. Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1002 (2d Cir. 1995); Fisher-Price, 25 F.3d at 122-23; Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139 (2d Cir. 1992); Rogers v. Koons, 960 F.2d 301, 306 (2d Cir. 1992). To prove infringement, a plaintiff must demonstrate that (1) the defendant has actually copied the plaintiff's work; [*25] and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's. Fisher-Price, 25 F.3d at 122-23; Laureyssens, 964 F.2d at 140.

## A. Basha's Copyright is Valid and Basha has Standing to Bring an Infringement Action as to All Staurino Fratelli Pendants

Apart from certain exceptions not applicable here, a copyright claimant must obtain a registration from the

Page 9

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

United States before bringing suit for copyright infringement. 17 U.S.C.A. § 411 (West 1996); Pristine Industries, Inc. v. Hallmark Cards, Inc., 753 F. Supp. 140, 148 (S.D.N.Y. 1990) (valid federal copyright registration is a necessary element of infringement action).

Basha obtained a single registration for the baby-shoe pendants. The application stated that the work is a jewelry design entitled "It's Shoe Time", authored by Staurino Fratelli and first published in November of 1994. The application was accompanied by a photograph depicting twelve different baby shoe pendants.

The Copyright statute permits registration of multiple related works under a single copyright application. n7 17 U.S.C.A. § 408(c) (West 1996). Single [*26] registration of multiple works was established in the 1976 amendment to § 408(c) in order to encourage authors to seek copyright registration. The House Report to the 1976 amendment states:

> The provision empowering the Register to allow a number of related works to be registered together as a group represents a needed and important liberalization of the law now in effect. At present the requirement for separate registrations where related works or parts of a work are published separately has created administrative problems and has resulted in unnecessary burdens and expenses on authors and other copyright owners. In a number of cases the technical necessity for separate applications and fees has caused copyright owners to forego copyright altogether. Examples of cases where these undesirable and unnecessary results could be avoided by allowing a single registration include ... *a group of related jewelry designs ...*

House Report on the 1976 Amendment of the Copyright Act, H.R. Rep. No. 1476, 94th Cong., 1st Sess. (1976) reprinted in 17 U.S.C.A. § 408 at 466 (West 1996)(emphasis added). The regulation governing single registration, set forth at 37 C.F.R. § [*27] 202.3, states in relevant part:

> (i) Registration as a single work. (1) For the purpose of registration on a single application and upon payment of a single registration fee, the following shall be considered a single work: (A) in the case of published works: All copyrightable

elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication, and in which the copyright claimant is the same ...

37 C.F.R. § 202.3(b)(3)(i)(A) (1996).

> n7 The section states in relevant part: The Register of Copyrights is authorized to specify by regulation the administrative classes into which works are to be placed for purposes of deposit and registration, and the nature of the copies or phonorecords to be deposited in the various classes specified. The regulations may require or permit, for particular classes, ... a single registration for a group of related works. 17 U.S.C.A. § 408(c)(1) (West 1996).

The Counterclaim Defendants assert that, because the baby [*28] shoe pendants are sold separately, they are not eligible for registration as a single work. They cite two cases in support of this position: Tabra Inc. v. Treasures Paradise Designs, Inc., 1990 U.S. Dist. LEXIS 11384, 15 U.S.P.Q.2D (BNA) 1234 (N.D.Cal. 1990) and Bruce & Company v. B.H. MultiCom. Corp., F. Supp. No. 96 Civ. 8083, 1997 WL 277998 (N.D. Ill. May 15, 1997). However, both cases turn on the question of relatedness of design rather than any evidence that the designs at issue were sold as a single unit.

In Tabra, the plaintiff's copyright was found invalid because the jewelry designs were not related works; the issue of publication as a "single unit" was not even raised. The plaintiff in Tabra included 250 jewelry designs in six separate copyright registrations, grouped by year only, without any attempt to connect the jewelry by distinguishing characteristics. The court found that the jewelry pieces covered by each of these registrations were a "conglomeration of designs" not necessarily bear any resemblance to each other: "The only apparent relationship is that many pieces are earrings and have a primitive look." Tabra, 15 U.S.P.Q.2D (BNA) at 1237. [*29] In contrast, Basha registered twelve closely related designs in its single application. All the pieces are baby shoe pendants shaped according to the specific dimensions created by Staurino Fratelli.

In Black, the defendant moved for summary judgment on the grounds that the plaintiff had defectively registered a group of unrelated rings in a single application. The Court agreed that the identifying materials submitted with the registration depicted "a conglomeration of ring designs which bear no

Page 10

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

resemblance to each other." Black, 1997 WL 277998 at *4. The plaintiff countered that the relatedness requirement set forth in 17 U.S.C. § 408(c) was satisfied because "the works are included in a 'single unit of publication' ... [where] the rings are offered for sale together as a line and appear together in their marketing material..." The court found that "whether the rings are sold separately or together as a line and whether that is sufficient" presented an issue of material fact, and denied summary judgment. Id. The court's reasoning in Black does not establish that group sale is a condition precedent for single registration of related works. Rather, the court considered [*30] without deciding whether "single unit of publication" would be an adequate proxy for the relatedness requirement of § 408(c). Id.

One other case has addressed the validity of a single registration for multiple related works. In Original Appalachian Artworks v. Toy Loft, 489 F. Supp. 174 (N.D. Ga. 1980), aff'd, 684 F.2d 821 (11th Cir. 1982), the plaintiff brought an infringement action regarding a group of soft sculpture dolls registered under the title "The Little People". Like Basha's baby-shoe pendants, the assorted dolls were variations on the same basic design. Although they were sold individually, the dolls were marketed as a single line. The plaintiff corporation would ship its dolls with written information suggesting the manner in which the dolls should be displayed and sold. The court found that the single registration number established a valid copyright for all of the plaintiff's doll designs:

> The court has ... concluded that the
> defendants have infringed plaintiff's
> copyright ... In reaching this conclusion,
> the court notes that the plaintiff's
> copyright registration number VA 35-804
> is sufficient to cover all of the differently-
> styled "Little People"  [*31]  that the
> plaintiff is presently manufacturing. See
> 37 C.F.R. 202.3(b)(3).

Id. at 180.

Like the dolls in Original Appalachian, Basha's baby shoe pendants are marketed as a single line. Basha consistently displays the pendants in a group in his shop window and advertisements. The pendants are variations on the same basic design; they are related by size, shape, proportion, use of bows or straps, and ornamentation with diamonds or french enamel. Thus, the pendants satisfy the relatedness requirement of § 408(c), and, as in Original Appalachian, this relatedness in appearance permits single registration of multiple works.

This conclusion comports with the purpose of § 408(c), which has been "consistently described as a 'permissive' registration provision". Jane C. Ginsburg, Copyright for the Nineties, (4th ed. 1993) at 381. The language and legislative history of the statute indicates that the only requirement for single registration of multiple works is "relatedness." There is no evidence in legislative history or case law that the "published in a single unit" language in 37 C.F.R. § 202.3 is meant to constitute an additional condition precedent to valid [*32] registration. n8 In fact, this conclusion is contradicted by the House Report on the 1976 amendment of 17 U.S.C. § 408(c), which explicitly states that the purpose of the amended section is to eliminate the "requirement of separate registrations where related works ... are published separately", thereby encouraging registration of such works as related jewelry designs. H.R. Rep. No. 1476 reprinted in 17 U.S.C.A. § 408 at 466. If the works satisfy the requirement of relatedness, as in the case of the Basha's baby-shoe pendants, an additional requirement that the works also be "published in a single unit" would undermine the purpose of the statute.

> n8 The regulatory language appears to have
> been drafted in order to protect copyrightable
> elements included in multi-media works, such as
> movies and computer games. See 2 Melville B.
> Nimmer, Nimmer on Copyright, §
> 7.18[C][3](1994) & n. 26 (noting that certain
> courts have "accorded too much weight to the
> formality of registration").

Counterclaim defendants [*33] also contend that not all of Basha's pendants are covered by the copyright, because the photograph which Basha appended to his application only included twelve versions of the shoe. A copyright registrant is required to submit two complete copies of the best edition of the work within three months after the date of such publication. 17 U.S.C.A. § 407(a) (West 1996):

> The requirement of *complete* copies ...
> means that the copies as deposited must
> be fully as complete in all elements ... as
> were the copies theretofore published.
> Thus if only a ... portion of the published
> work is deposited (such as the first of
> several published chapters) this will not
> comply with the statutory requirement of
> complete copies.

Page 11

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

2 Nimmer, § 7.17[E][2][a] at 7-183 (1991) (emphasis in original). n9

> n9 If the work is unwieldy, the registrant may deposit identifying material instead of copies. Id. § 408(c); House Report 1476 reprinted in 17 U.S.C.A. § 408 at 466; 2 Nimmer, § 7.17[E][2][e].

[*34]

Failure to deposit a complete copy of the work does not forfeit copyright protection, but it is a prerequisite for bringing an infringement action. Whimsicality, Inc. v. Rubie's Costume Co., Inc., 891 F.2d 452, 453 (2d Cir. 1989); Fonar Corporation v. Magnetic Resonance Plus, Inc., 920 F. Supp. 580, 583 (S.D.N.Y. 1996). However, errors contained in copyright registration, if committed without deceptive intent, are harmless and do not invalidate the copyright. Thomas Wilson & Co. v. Irving J. Dorfman, Co., 433 F.2d 409, 412 (2d Cir. 1970) (failure of second copyright application to refer to first, while "potentially more serious", would not bar copyright protection because made innocently); Gund, Inc. v. Swank, Inc., 673 F. Supp. 1233, 1237 (S.D.N.Y. 1987) (error in date of creation and failure to refer to stuffed lion as derivative work not fatal to standing to bring action); Data General Corp. v. Grumman Systems Support Corp., 825 F. Supp. 340 (D.Mass 1993) (several clerical errors in deposit copy of software program not fatal to standing to bring action); See also 2 Nimmer, § 7.20 (discussing long history of courts permitting plaintiff to bring infringement [*35] action where errors in registration were unaccompanied by fraud.) Thus, Basha's copyright in the pendants omitted from the deposit photograph is valid, and because there is no evidence that Basha submitted the photograph with an intent to deceive, his standing to bring this action is intact as to all pendants.

**B. Evidence of Actual Copying**

A plaintiff in a copyright infringement action may prove actual copying either by direct evidence, or by indirect evidence showing the defendant's access to the copyrighted work and similarities that are probative of copying between the works termed "probative similarity". Fisher-Price, 25 F.3d at 123; Laureyssens, 964 F.2d at 140.

Access is established either by demonstrating that (1) the infringed work has been widely disseminated, or (2) a particular chain of events exists by which the alleged infringer might have gained access to the copyrighted work. Repp v. Webber, 892 F. Supp. 552, 556-57 (S.D.N.Y. 1995). The term "probative similarity" is used to distinguish the analysis used to determine whether copying occurred from the substantial similarity analysis used to determine whether that copying constitutes infringement. [*36]

Probative similarity analysis requires consideration of the entire work, while substantial similarity analysis requires comparison only of the protected features. Fisher-Price, 25 F.3d at 123 (citing Alan Latman, Probative Similarity as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement, 90 Colum.L.Rev. 1187, 1214 (1990)); Kurt S. Adler, Inc. v. World Bazaars, Inc., 897 F. Supp. 92, 93 (S.D.N.Y. 1995); Tienshan, Inc. v. C.C.A. International, 895 F. Supp. 651, 656 (S.D.N.Y. 1995); 3 Nimmer, § 13.03[A], at 13-29 (1996).

**1. Actual Copying by Finesse**

As to one particular gold and diamond bowed pendant, direct evidence was presented that Finesse d/b/a Linea Aurea copied Staurino Fratelli's design. The Etessamis acknowledged importing baby shoe pendants manufactured by MDC in Italy, which a jewelry trade show jury had found to be copies of Staurino Fratelli's design. After importing MDC pendants, Linea Aurea themselves manufactured baby shoe pendants. Although the Etessamis maintained that they had used models created in 1985 by the designer Archangel to manufacture their pendants, they had lost the model used to create one particular [*37] line of pendants and their mold-maker could not recall whether he had used the Archangel model to manufacture those pendants. Comparison of the Linea Aurea pendant made from this missing model and an MDC pendant reveals an almost identical appearance; both are made of gold, with a diamond-covered bow set on a band across the toe, and are similarly proportioned, although the Linea Aurea shoe is very slightly smaller than the MDC shoe. Both of these pendants are almost identical to one made by Staurino Fratelli. A reliable expert witness testified that the Linea Aurea gold pendant was copied from the MDC pendant, which would result in a slightly smaller size.

As to the rest of Linea Aurea's pendants, indirect evidence of copying by Linea Aurea was provided by a demonstration of access and probative similarity. Linea Aurea had access to the baby shoe pendants both in Europe and the United States. Since 1994 Staurino Fratelli has displayed its baby shoe pendants at all the major European trade shows, as well as in extensive advertising in European and specifically Italian jewelry trade magazines. Both Etessamis attended several of the European shows. The Etessamis also receive the trade [*38] magazines carrying Staurino Fratelli's

Page 12

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

advertisements. n10 Kevin Etessami visited the Staurino Fratelli Booth at the Vicenza show in January 1997 and ordered several baby shoes. The Etessamis also had access to the baby shoe pendants in the United States through Basha's displays at trade shows and advertisements in various magazines and postcards. This evidence supports a determination that the Etessamis had access to the Staurino Fratelli designs. See Kurt S. Adler, 897 F. Supp. at 93-94 (finding access established by the display at two trade shows attended by defendant).

n10 Although Robert Etessami denied having seen any ads for Staurino Fratelli baby shoe pendants, his testimony carries less weight because he is a self-interested witness.

Probative similarity has been established between Basha's pendants and those produced by Linea Aurea as follows:

(a) one of Basha's pendants is a gold shoe with a diamond-covered bow set on a diamond-covered band across the toe. Linea Aurea imported a pendant made by [*39] MDC which is gold, with a diamond-covered bow set on a plain band across the toe. Linea Aurea also manufactured a gold shoe pendant with a diamond-covered bow set on a diamond-covered band across the toe. Both the imported MDC pendant and Linea Aurea manufactured pendant are similar in proportion to the Basha pendant, albeit slightly smaller in size. The MDC pendant carries its trademark inside on the sole of the shoe. The Linea Aurea manufactured pendant carries a mark designating its gold content also inside on the sole. The Basha shoe also has a trademark stamped inside on the sole of the shoe, albeit slightly closer to the heel;

(b) one of Basha's pendants is made of enamel-covered gold and has a diamond-covered bow set on a diamond-covered band running across the toe. The toe of the shoe is covered in red french enamel, and black enamel covers the sides and back. A trademark is stamped on the inside sole of the shoe towards the heel. The Linea Aurea pendant is also made of enamel-covered gold. The bow is white french enamel, with a diamond set on the center knot. The toe of the shoe is covered in red french enamel and dark blue enamel covers the sides and back. There is no mark [*40] stamped inside the shoe.

(c) one of Basha's pendants is made of plain gold with a diamond-covered strap across the instep. There is no band or ornamentation on the toe. A trademark is stamped on the inside sole of the shoe towards the heel. The Linea Aurea pendant is also made of gold with a

diamond-covered strap across the instep. There is a plain gold band across the toe. There is no trademark stamped on the inside sole.

(d) one of Basha's pendants is made of enamel-covered gold and has a diamond-covered strap across the instep and a gold band across the toe. Black enamel covers the toe, and white covers the sides and back. There is a trademark stamped on the inside sole near the heel. The Linea Aurea pendant is made of enamel-covered gold with a silver strap across the instep and blue enamel on the toe, sides and back. There is a trademark stamped on the inside sole near the heel.

In general, the Linea Aurea pendants are similarly proportioned as the Basha pendants, and follow two of the three basic variations established in Staurino Fratelli's designs, either bow set on a band across the toe, or strap across the instep with a band across the toe. Besides the differences noted [*41] above, the Linea Aurea pendants are smaller in size. However, the sum of the many similarities is sufficiently probative to conclude that Linea Aurea actually copied its pendants.

Linea Aurea attempts to rebut Basha's prima facie case of actual copying by asserting that its pendants were made from designs independently created by Archangel in 1984. "If the plaintiff meets its burden of establishing access and similarity, the defendant must then come forward with credible evidence of independent creation to negative the inference of copying." Arrow Novelty Company Inc. v. ENCO National Corp., 393 F. Supp. 157, 160 (S.D.N.Y. 1974) aff'd 515 F.2d 504 (2d Cir. 1975). However, "even with such evidence from the defendant, there may be such substantial similarity that no other explanation other than copying is reasonably possible." Novelty Textile Mills Inc. v. Joan Fabrics Corp, 558 F.2d 1090, 1092 n. 2 (2d Cir. 1977); Imperial Textile Co. of New York, Inc. v. Ametex Fabrics Inc., 682 F. Supp. 18, 19 (S.D.N.Y. 1987); Arrow Novelty, 393 F. Supp. at 160. 3 Nimmer, § 13.01[B] at 13-13.

In Imperial Textile, the defendant presented several witnesses who testified [*42] that it had independently created its fabric design, which contained the same pattern and colors as the plaintiffs most successful design. The court accepted the defendant's contention that the source of its pattern came from in-house fabrics the defendant already had on hand, but rejected the defendant's conception that the spacing concept, size, selection of colors and arrangement of the pattern were the result of independent creation. The court based its rejection on strong evidence of access and a similarity so close that "to conclude otherwise would be to find coincidence that defies belief." Imperial Textile, 682 F. Supp. at 19. The facts in the instant case are similar.

Page 13

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

While the Etessamis may have used Archangel's models for the basic slipper used in the baby shoe pendants, the ornamentation with french enamel in bright colors, and diamonds arranged on bow or strap, are too similar to the design choices made by Staurino Fratelli to be mere coincidence. The Etessamis did not decide to use Archangel's models until after Kevin Etessami began importing the MDC copies of Staurino Fratelli's design. Moreover, the Etessamis have never produced those of Archangel's designs which [*43] differ from the Staurino Fratelli designs, such as a bootie version, a slipper without a strap or bow, and a slipper with a bow on the side of the strap. This chain of circumstances weakens the Etessamis assertions of independent creation, and re-establishes the conclusion that Linea Aurea's pendants were created to imitate Staurino Fratelli's designs.

### 2. Actual Copying by Tess

Copying by Tess was established by indirect evidence of access and probative similarity. Evidence of access included Tess' visit to the Staurino Fratelli booth at the Vicenza show in January 1997 with her brother in law Kevin Etessami, when she attempted to order Staurino Fratelli baby shoe pendants at that time. Also, Tess admitted seeing Basha's promotional postcard sometime in January or February 1997. It is also probable that Tess would have seen Basha's advertisements in various magazines.

In March or April 1997, Tess produced a promotional postcard that resembled Basha's both in design and in the individual shoes depicted. She obtained baby shoe pendants from Kevin Etessami and arranged them within the photograph in a chain across the top of the picture, as Basha had done in his postcard. [*44] She inserted her business' name above the chain in fancy script similar to that used by Basha. Tess' postcard is almost identical in size and shape to Basha's. While the shoes in the bottom half of Tess' postcard are loosely grouped, rather than linked by a fine gold chain as in Basha's, this difference does not outweigh the similarity between Tess' other design decisions and the choices used by Basha. Moreover, 21 of the 28 pendants in Tess' postcard were manufactured by Linea Aurea, and these pendants closely resembled Basha's.

### 3. Actual Copying by Behnam

Copying by Behnam was also established by indirect evidence. Behnam obtained access to Basha's pendants when Fox attended the Vicenza show in January 1996 and the Basel show in April 1996 and read the catalogues produced for those trade fairs. While Fox denied reading some of the magazines in which the Basha pendants were advertised, he acknowledged that it was his job to keep

abreast of trends in the jewelry trade. Given the pervasive advertising of the pendants by both Basha in the United States and Staurino Fratelli in Europe, it is unlikely that Fox could have failed to note their designs. Finally, Behnam used six [*45] pendants for a promotional mailing which closely resembled Basha's shoes. Because not all of Behnam's pendants are similar to those of Basha, the choice of those which most closely resemble the Staurino Fratelli designs raises the inference that Behnam had access to Basha's ads and was attempting to benefit from the popularity of his pendants.

As detailed above, probative similarity has been established between the six Behnam pendants depicted in the post card and Basha's pendants, as follows:

(a) several of Basha's pendants are made of enamel-covered gold with a diamond-covered strap across the instep, contrasting colors of enamel on toe and back, and seven diamonds set in the enamel on its toe, four in a cluster on the right and three scattered on the left. Behnam has two pendant with a diamond-covered strap across the instep and diamonds arranged in an identical manner to the stones on Basha's pendants, although Behnam's pendants are not coated with enamel, and one is silver rather than gold;

(b) one of Basha's pendants is made of gold with a diamond-covered bow set on a diamond-covered band across the toe. Behnam has two gold pendants with a diamond-covered bow, although there [*46] is no band across the toe, and one of the pendants has a colored stone set in the center knot of the bow;

(c) one of Basha's pendants is made of gold, with a plain strap across the instep and diamonds covering the toe only. Behnam also carries a gold pendant with a plain strap across the instep and a diamond-covered toe;

(d) one of Basha's pendants is gold with a diamond-covered strap across the instep and no decoration on the toe. Behnam carries a pendant made of gold with a diamond-covered strap and a plain gold band across the toe.

Finally, both Basha's and these six of Behnam's pendants are similar in their rounded proportions, although the Behnam pendants are slightly smaller and have a circular opening rather than an oval opening, as in the Basha pendants. This evidence of access and similarity leads to a conclusion that the six shoes depicted in Behnam's postcard were copied from Staurino Fratelli's design. n11

n11 The other 42 Behnam pendants differ
from Basha's because of their smaller size,

Page 14

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

different ornamentation or both.

[*47]

Behnam attempts to rebut this conclusion with the defense of independent creation, but its evidence is unpersuasive. Behnam did not offer testimony by the designer, "the one person who knows first hand whether [the pendants] were copied." Tienshan, 895 F. Supp. At 658. Behnam's witness, Fox, testified that he provided sketches of baby shoes to a designer, but could not assert from first hand knowledge that the designer had used only his sketches when preparing her drawings. The details of Behnam's pendants differed from the details in the designer's drawings, but resembled the details in Staurino Fratelli's pieces. As set forth above, Fox had ample opportunity to observe the Staurino Fratelli pendants at trade shows and in Basha's advertisements. It is not unlikely that his designer, also a member of the jewelry trade, would have had equal access to Staurino Fratelli's designs.

### C. Substantial Similarity

Once actual copying is established, Basha must show that "the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists between the two works." Laureyssens, 964 F.2d at 140. Analysis of substantial similarity [*48] requires a "sharper focus" than that of probative similarity, for it includes only the protectible elements of the two works. Fisher Price, 25 F.3d at 123. "That is, the plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea." This determination is not an exact science. Id.

In most cases the test for substantial similarity is the "ordinary observer test", which determines whether an ordinary lay observer would recognize the alleged copy as having been appropriated from the copyrighted work. Knitwaves, 71 F.3d at 1002 (citing Folio Impressions, 937 F.2d at 766); Laureyssens, 964 F.2d at 141 (citing Peter Pan Fabrics, Inc. v. Martin Weiner Corp, 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand., J.)). Where, as here, the works contain both protected and unprotected elements, the Second Circuit applies the "discerning ordinary observer test", which examines similarity between the protectible elements of the plaintiff's work and the copy. Knitwaves, 71 F.3d at 1002; Fisher-Price, 25 F.3d at 123; Laureyssens, 964 F.2d at 141; Tienshan, 895 F. Supp. at 657. However, [*49] the Second Circuit cautions that in applying the more discerning inquiry, district courts should compare "the works' total concept and feel." Knitwaves, 71 F.3d at 1003, (citing Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340,

358, 362, 113 L. Ed. 2d 358, 111 S. Ct. 1282).

There is a tension between the discerning ordinary observer test, which requires extraction and comparison only of protectible elements, and the Knitwaves court's direction that a determination of substantial similarity should rely on the work's "total concept and feel." See M.H. Segan Limited Partnership v. Hasbro, Inc., 924 F. Supp. 512, 520 (S.D.N.Y. 1996) ("Although the [more discerning ordinary observer test] requires that the Court exclude unprotectible ideas ... it must examine the 'total concept and feel' of the executed works.") At the root of these conflicting values is a concern that extraction of protectible elements would eliminate protection for works which are an original compilation of unprotected elements which, as the Supreme Court made clear, should be included under the aegis of the copyright statute. Feist, 499 U.S. at 358. As the Knitwaves court observed, [*50] if extracting only protectible elements was taken to its logical conclusion, "[courts] might have to decide that there can be no originality in a painting because all colors of paint have been used somewhere in the past." Knitwaves 71 F.3d at 1003. To avoid this extreme, this Court must strike a balance between extraction of protected elements and consideration of overall look and feel when applying the discerning ordinary observer test:

> Through Knitwaves, the Second Circuit has recently reconfirmed that the more discerning ordinary observer test is not an invitation to dissect a work into its constituent elements or features. The works as a whole must be compared to each other.

M.H. Segan, 924 F. Supp. at 521.

The question of substantial similarity is largely answered by the comparison conducted in the probative similarity analysis. Tienshan, 895 F. Supp. at 658. However, it is necessary to identify the protectible elements of Basha's pendants. Id. Staurino Fratelli created three basic designs of baby shoe pendant: one with a bow set on a band running across the toe; one with a strap across the instep and a band running across the toe; one [*51] with a strap and no band across the toe. The proportions of the shoe were specifically adjusted to be round, even bulbous, with an ovoid opening to the shoe, creating an overall look of chubbiness. Protectible elements are found in Staurino Fratelli's different arrangements of the ornamentation with french enamel and diamonds, such as the setting of diamonds on strap or bow and band, the use of contrasting colors of french enamel on toe and sides, and the pattern of the seven stones on the toe. See, Knitwaves, 71 F.3d 996, 1004

Page 15

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

(finding selection of leaves and squirrels as dominant design elements, fall palette of colors, and arrangement of elements into pattern to be protectible); Tienshan, 895 F. Supp. at 658-59 (finding placement on box of text, trademark, logo and photographs of actual plates and bowls to be protectible); Saban Entertainment, Inc. v. 222 World Corp., 865 F. Supp. 1047, 1051 (S.D.N.Y. 1994) (features in Power Ranger cartoon characters rarely found in combination distinguish them from generic masked heroic figures).

As set forth above, comparison of Linea Aurea's pendants to those sold by Basha reveals a close resemblance in protected features as well as [*52] overall look and feel. The shoes are almost identical in size and shape. Linea Aurea's shoes also incorporate two of the three basic variations established by Staurino Fratelli. Linea Aurea's shoes are ornamented similarly to those carried by Basha, for example, Linea Aurea coats its shoes with french enamel and insets diamonds on the band and strap. Even the choice of colors for the enamel is similar. While the Linea Aurea shoes are slightly smaller, they closely resemble Basha's pendants in their rounded proportions. In sum, sufficient similarities exist in both protectible elements and in the "total concept and feel" that a discerning observer would conclude that one was the copy of another.

As set forth above, comparison of Behnam's line of pendants to the Basha pendants reveals substantial similarity in six of Behnam's 48 pendants. These include the two pendants with the seven stones arranged on the toe, the two pendants with diamond-covered bows on the toe, the pendant with a plain strap across the instep and diamonds covering the toe, and the pendant with the diamond-covered strap across the instep.

**D. Merger Defense: Idea/Expression**

Both Linea Aurea and Behnam [*53] contend that Staurino Fratelli's expression of baby shoes is merged with the idea of baby shoes, and is therefore unprotectible, and that the similarities between their pendants and those of Basha/Staurino Fratelli are common to any execution of the idea of baby shoes. Citing Herbert Rosenthal Jewelry Corporation v. Kalpakian, 446 F.2d 738 (9th Cir. 1971). In Rosenthal, the court ruled that despite evidence of actual copying and substantial similarity between the jeweled bee pins created by plaintiff and defendant, no infringement had occurred, because "the idea and its expression appear to be indistinguishable" and the similarities observed were "inevitable from the use of jewel-encrusted bee forms in both." Id. at 742. According to this doctrine, "the idea and expression will coincide when the expression provides nothing new or additional over the idea," Sid &

Marty Krofft Television Productions, Inc. v. McDonald's Corporation, 562 F.2d 1157, 1168 (2d Cir. 1977), however, "the complexity and artistry of the expression of an idea will separate it from even the most banal idea." Id.

While there is no dispute that the simple idea of baby shoe pendant is unprotectible, [*54] "from an artistic standpoint, there is, indeed, a virtually infinite variety of ways to express the idea of [baby shoes]." Kurt S. Adler, 897 F. Supp. at 95. In the instant case, Staurino Fratelli has designed a version of a baby shoe pendant which is more complex and artistic than the banal idea of baby shoe pendants. David Staurino testified that he spent two months adjusting the exact size, style and proportions of the pendant. He then designed several specific ornamentations of the shoe, using diamonds, french enamel, gold and silver. These specific choices as to size, shape, proportion, and ornamentation constitute an artistic expression of a baby shoe pendant beyond its stereotypical features. In sum, the Staurino Fratelli pendants contain far more than the "dash of originality" needed to provide copyright protection. Tienshan, 895 F. Supp. at 658 (citing Rogers, 960 F.2d at 307).

Moreover, the Counterclaim Defendants' own evidence undercuts their claims of idea/expression merger. First, Defendants produced an actual baby shoe and a silver baby shoe ornament to establish that Staurino Fratelli merely used the basic idea of a baby shoe, but, in fact, the shoe and [*55] ornament differed in design from the pendants made by Staurino Fratelli: both sported both strap and bow; neither included a band across the toe. Second, the drawings by the defendants' own designers contained variations on a baby shoe which do not appear in Staurino Fratelli's designs, such as a bootie, a sneaker, a slipper without bow or strap, and a strapped instep with a bow on the side. In light of these many alternative versions of baby shoe design, the Counterclaim Defendants merger defense must fail.

For the reasons set forth above, Basha has demonstrated a likelihood of success on the merits in its claim of copyright infringement.

**II. Irreparable Harm**

Where a plaintiff makes out a prima facie case of copyright infringement, irreparable injury can be presumed. Fisher-Price, 25 F.3d at 123; Kurt S. Adler, 897 F. Supp. at 96; Tienshan, 895 F. Supp. at 659; Golden Bear, 27 U.S.P.Q.2d at 1552. As explained by the Second Circuit:

> This is because the confusion created in
> the marketplace will damage the copyright

Page 16

1997 U.S. Dist. LEXIS 15957, *; 45 U.S.P.Q.2D (BNA) 1078;
Copy. L. Rep. (CCH) P27,756

holder in incalculable and incurable ways ... confusion may cause purchasers to refrain from buying either product and to turn to those [*56] of other competitors. Furthermore, if an infringer's product is of poor quality, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

Fisher-Price, 25 F.3d at 124 (internal quotations and ellipses omitted). Basha presented testimony to support this presumption; customers and authorized retailers have complained about the presence of "knock-off" versions being sold in the marketplace at a lower price, and several exclusive retailers have informed him that they will not market his baby shoe pendants if the presence of knock-offs continues. Linea Aurea, Tess and Behnam have not presented any evidence to rebut this presumption.

### IV. Motion for Recall

Basha requests an order directing the Counterclaim Defendants to recall all infringing pendants sold to customers. Linea Aurea claims that it has sold 100,000 baby shoe pendants since September 1996. Behnam has not provided a figure of its total sales, although the figure would have to be adjusted to include only those shoes which have been determined to be substantially similar to the Staurino Fratelli pendants.

"The imposition of a recall requirement is well [*57] within the district court's broad powers as a court of equity." Perfect Fit Industries, Inc. v. Acme Quilting Co. Inc., 646 F.2d 800, 805 (2d Cir. 1981). A district court must consider the likely burden and expense of a recall to the defendant, and balance that burden against the benefit that would accrue to the plaintiff. Id. at 807. In this case, the burden to the Counterclaim Defendants in recalling existing stock ordered by other jewelry businesses would not be unduly burdensome. The Counterclaim Defendants need only write a letter to its wholesale customers and pay the cost of the return for customers who comply. Id. The recall of wholesale orders would significantly benefit Basha, who has testified that he risks losing customers if the infringing shoes are disseminated in the general marketplace.

However, the recall order will not apply to existing stock ordered by individual customers for personal use. Eve of Milady v. Impression Bridal, Inc., 957 F. Supp. 484, 491(S.D.N.Y. 1997). In Eve of Milady, the court

issued a recall order as to infringing bridal gowns which had been ordered by retailers, but not as to gowns which had been ordered by individual customers [*58] because "such an order would be a source of immediate prejudice to the brides who had planned to wear the defendants' dresses at their weddings." Id. In the instant case, the baby shoe pendants are likely presents for new parents, and recall would impose prejudice to the individual customers who have already formed sentimental associations between the pendants and their babies. Recall to individual customers would also impose a greater burden on the Counterclaim Defendants.

### V. Motion for Expedited Discovery

Basha also moves for expedited discovery pursuant to Rules 30(a), 33(a) and 34(a) of the Federal Rules of Civil Procedure in order to discover the full nature of each counterclaim defendant's infringing activities. District Courts have broad power to permit expedited discovery in appropriate cases, see Rules 26(d), 33(a) and 34(b), Fed. R. Civ. P., and such discovery is routinely granted in actions involving infringement and unfair competition. See, e.g., Revlon Consumer Products Corp. v. Jennifer Leather Broadway, 858 F. Supp. 1268, 1269 (S.D.N.Y. 1994), aff'd without opinion, 57 F.3d 1062 (2d Cir. 1995); Francis S. Denney, Inc. v. I.S. Lab, Inc., 737 [*59] F. Supp. 247, 248 (S.D.N.Y. 1990). Basha's discovery motion will be granted.

### Conclusion

For the reasons set forth above, and pending a trial on the merits of this action, it is hereby ordered that J.D. Finesse d/b/a Linea Aurea, Katherine Tess Inc. and Behnam are enjoined from manufacturing or selling any baby shoe pendants which are substantially similar to the Staurino Fratelli pendants licensed to Aron Basha. It is also ordered that Behnam and Finesse recall infringing pendants which have been sold to its wholesale customers.

Basha's motion for expedited discovery regarding the full nature of each Counterclaim Defendant's infringing and improper activities is also hereby granted.

It is so ordered.

**New York, New York**
**July 18, 1997**

    **ROBERT W. SWEET**

    **U.S.D.J.**

LEXSEE 1990 U.S. DIST LEXIS 12743

**FIRST COMMONWEALTH CORPORATION, UNIVERSAL GUARANTY LIFE INSURANCE CO., ET ALS v. PUBLIC INVESTORS, INC., ET ALS**

**Civil Action No. 90-3316**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

**1990 U.S. Dist. LEXIS 12743**

**September 25, 1990, Filed**

**LexisNexis(R) Headnotes**

**JUDGES:** [*1]

Ronald A. Fonseca, United States Magistrate.

**OPINIONBY:**

FONSECA

**OPINION:**

PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY

Granted. Plaintiffs seek production of documents which will establish the extent of defendant's liability to them in this action and which constitute in part original evidence of indebtedness. Aside from the usual right of a party to discovery in a civil action, it would appear from documentation submitted by plaintiffs that defendant has an independent contractual obligation to make available the documents requested, but have failed to honor that obligation.

Defendant, in opposition to plaintiffs' motion, suggests that entitlement to expedited discovery requires a moving party to satisfy the same grounds which would support a request for issuance of a temporary restraining order. See Poughkeepsie Savings Bank, F.S.B. v. Morash, 1989 WL 40008, 10 (S.D.N.Y. 1989). We decline to follow Poughkeepsie. Poughkeepsie's criteria would create an insurmountable barrier to expedited discovery, except in the most egregious circumstances, and which is not mandated by the rules on discovery.

Rule 34(b) of the Federal Rules of Civil Procedure provides in relevant part:

The court may allow a [*2] shorter or longer time [for production of documents requested].

It is clear from this language that the rules intend to vest discretion in the Court to extend or shorten the time for production of documents. See United States v. A. B. Dick Co., 7 F.R.D. 442 (N.D. Ohio 1947); EEOC v. New Enterprise Stone and Lime Co., Inc., 74 F.R.D. 628 (W.D. Penn. 1977); (interpreting respectively, a similar provision in Rule 33(a)).

It is therefore ordered that defendant comply with plaintiffs' request for production on or before September 27, 1990 at Noon.



# United States District Court

## WESTERN DISTRICT OF NORTH CAROLINA

### SUBPOENA IN A CIVIL CASE

ALVIS COATINGS, INC.,
            Plaintiff,                                    Case Number:
        v.
JOHN DOES ONE THROUGH TEN,
            Defendants.

TO:    BOBVILA.COM, 115 Kingston Street, Third Floor, Boston, MA 02111

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

### SEE EXHIBIT "A", ATTACHED

| PLACE | DATE AND TIME |
|---|---|
| Alston & Bird LLP, Attention:  Jason M. Sneed, Esq. 101 South Tryon Street, Suite 4000 Charlotte, NC 28280-4000 | The fifth business day after service of this subpoena 9:30 a.m. |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

        Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)                          Attorney for Plaintiff | DATE |
|---|---|
| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER **Jason M. Sneed and S. Benjamin Pleune, Alston & Bird LLP 101 South Tryon Street, Suite 4000, Charlotte, NC 28280** | Ph: **(704) 444-1000** |

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

# PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

# DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                          DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles form the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# EXHIBIT "A"

## INSTRUCTIONS

1.      Pursuant to Federal Rule of Civil Procedure 45(d)(1), documents produced in response to this subpoena duces tecum shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the categories in the demand.

2.      All responsive documents stored in machine-readable form shall be produced in electronic form and in hard-copy form with the printout date and file name and location appearing on the copy.

3.      Documents attached to each other or consisting of multiple pages must not be separated.

4.      In producing documents, furnish all documents within your possession, custody, or control, as well as all documents within the possession, custody, or control of your agents; representatives; employees; officers; directors; attorneys; parent, subsidiary, or affiliated corporations; or anyone else acting on your behalf.  This subpoena duces tecum also embraces originals, identical copies if originals are unavailable, and non-identical copies (whether different from the originals because of notes made on such copies or otherwise) of the documents described in this subpoena duces tecum.

5.      When a claim of privilege is asserted in responding or objecting to any category demanded and documents are not provided on the basis of such assertion:

(a)      the person, entity, party, or attorney asserting the privilege shall in the response or objection to the demanded category identify the nature of the privilege (including work product) which is being claimed and, if the privilege is being asserted in connection with a claim or defense governed by state law, indicate the state's privilege rule being invoked; and

(b)     the following information shall be provided in the response or objection unless divulgence of such information would cause disclosure of privileged information:

(i)     for documents: Describe such document by: (a) date, or if no date is indicated, an estimate of that date; (b) type; (c) subject matter as described on the document or, if no such description appears, then some other description sufficient to identify the document; (d) the name and address of each person who prepared the document; (e) the name and address of each person to whom the document was sent; (f) the name and address of each person for whom the document was prepared; (g) the name and address of each person to whom the document or any portion thereof was provided, if any; (h) the name and address of each person now in possession thereof; and (i) where not apparent, the relationship of the author, addressee, and any other recipient to each other;

(ii)     for oral communications: Identify: (a) the name of the person making the communication and the names of persons present while the communication was made and, where not apparent, the relationship of the persons present to the person making the communications; (b) the date and place of communication; and (c) the general subject matter of the communication.

6.     To the extent permitted and authorized by law, this subpoena duces tecum shall be deemed continuing so as to require further and supplemental responses and production if you obtain additional documents between the time of initial production and the time of hearing or trial.

7.     You are to retain copies of all documents relevant to this suit that are currently in existence.

- 4 -

8.     If any document that would have been responsive has been destroyed or is otherwise no longer in your possession, custody, or control: (a) describe the content of the document and state the location of all copies of it; and (b) state the date of and identify the person responsible for its destruction, loss, transfer, or other action by which the document left your possession, custody, or control.

9.     Each paragraph herein shall be construed independently and not by reference to any other paragraph for the purpose of limitation.

## DOCUMENT REQUESTS

1.      All documents that refer, relate, or in any way pertain to the Internet bulletin board messages set forth below, including any and all documents showing the electronic addresses corresponding to each bulletin board message, all registration records associated with each message, and documents sufficient to identify the name, address, and telephone number of the poster(s) of each of the following bulletin board messages:

> http://www.bobvila.com/wwwboard/messages/210546.html
> http://www.bobvila.com/wwwboard/messages/211734.html
> http://www.bobvila.com/wwwboard/messages/214946.html
> http://www.bobvila.com/wwwboard/messages/214027.html
> http://www.bobvila.com/wwwboard/messages/215058.html
> http://www.bobvila.com/wwwboard/messages/210199.html
> http://www.bobvila.com/wwwboard/messages/212173.html
> http://www.bobvila.com/wwwboard/messages/215268.html
> http://www.bobvila.com/wwwboard/messages/209918.html
> http://www.bobvila.com/wwwboard/messages/210945.html
> http://www.bobvila.com/wwwboard/messages/211549.html
> http://www.bobvila.com/wwwboard/messages/211599.html
> http://www.bobvila.com/wwwboard/messages/208205.html
> http://www.bobvila.com/wwwboard/messages/207445.html
> http://www.bobvila.com/wwwboard/messages/208333.html
> http://www.bobvila.com/wwwboard/messages/158925.html
> http://www.bobvila.com/wwwboard/messages/185841.html
> http://www.bobvila.com/wwwboard/messages/195845.html
> http://www.bobvila.com/wwwboard/messages/195850.html
> http://www.bobvila.com/wwwboard/messages/203217.html
> http://www.bobvila.com/wwwboard/messages/203610.html
> http://www.bobvila.com/wwwboard/messages/203624.html
> http://www.bobvila.com/wwwboard/messages/203301.html
> http://www.bobvila.com/wwwboard/messages/203617.html
> http://www.bobvila.com/wwwboard/messages/204527.html
> http://www.bobvila.com/wwwboard/messages/204812.html
> http://www.bobvila.com/wwwboard/messages/204817.html
> http://www.bobvila.com/wwwboard/messages/224583.html
> http://www.bobvila.com/wwwboard/messages/221888.html
> http://www.bobvila.com/wwwboard/messages/226703.html
> http://www.bobvila.com/wwwboard/messages/223234.html
> http://www.bobvila.com/wwwboard/messages/222605.html
> http://www.bobvila.com/wwwboard/messages/173760.html
> http://www.bobvila.com/wwwboard/messages/136017.html

CI.T01/4659405v1

http://www.bobvila.com/wwwboard/messages/131030.html

2.     For each posting identified in paragraph (1) above, all communications between you and any poster(s) of the bulletin board message and/or any third party regarding the message, including but not limited to, documents sufficient to identify the name, address, telephone number, and email address of all parties involved in such communication.

3.     Any and all other documents that relate to or identify the source of the postings identified in paragraph (1) above.

CLT01/4659405v1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALVIS COATINGS, INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>JOHN DOES ONE THROUGH TEN, )<br><br>Defendants. ) | Civil Action No. |

## ORDER EXPEDITING PRELIMINARY DISCOVERY

Alvis Coatings, Inc. has filed *Plaintiff's Emergency Motion for Leave to Conduct Limited Expedited and Preliminary Discovery* requesting expedited preliminary discovery pursuant to Rule 26(d) of the Federal Rules of Civil Procedure for the limited purposes of (a) securing the information necessary to identify the Defendants and determine the Defendants' locations and legal status and (b) preserving the information necessary for Plaintiff to prosecute its claims against Defendants. Upon consideration thereof, and for good cause shown, the Court grants Defendant's Motion.

Now, therefore, it is ORDERED, ADJUDGED AND DECREED that Plaintiff shall be permitted to take discovery immediately for the limited purposes of identifying the Defendants, determining the Defendants' location and legal status, and preserving evidence necessary for trial.

It is FURTHER ORDERED that Plaintiff may require full and complete responses to any subpoenas or other discovery it serves pursuant to this Order within five (5) business days of



service, and that Plaintiff shall serve a copy of this ORDER EXPEDITING PRELIMINARY

DISCOVERY with any such subpoenas or other discovery issued.

SO ORDERED, this _____ day of _____, 2004.

_____

CLT01/4656316v1